UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

AIRFRAME SYSTEMS, INC. f/k/a
AIRLINE SOFTWARE, INC.,

       Plaintiff,

                              Case No:

       v.

RAYTHEON COMPANY and
L-3 COMMUNICATIONS CORPORATION,

       Defendants.

---

## COMPLAINT AND JURY DEMAND

Plaintiff AIRFRAME SYSTEMS, INC., by its attorneys Lurie & Krupp, LLP, and Bruce I. Afran, asserts as follows:

### Parties, Jurisdiction and Venue

1. Plaintiff (hereafter "Airframe"), formerly known as Airline Software, Inc., is a corporation organized under the laws of the State of Delaware and is authorized to conduct business in the State of New York.

2. In December 2004 plaintiff changed its name to Airframe Systems, Inc., which is the name used in this instant complaint.

3. Plaintiffs' principal office at all relevant times has been in Suffern, New York.

4. Defendant Raytheon Company (Raytheon) is a corporation organized under the laws of the State of Delaware with its principal place of business in the District of Massachusetts.

5. Defendant L-3 Communications Corporation (L-3), is a corporation organized under the laws of the State of Delaware and conducts business in the District of Massachusetts.

6. Jurisdiction is properly vested in this Court pursuant to 28 U.S.C. §1331 by virtue of a federal question arising under the Copyright Act, 17 U.S.C. §504, et seq.

7. Venue is properly vested in the District of Massachusetts by virtue of defendant Raytheon's principal offices being situated in this District.

### Factual Background

8. On or about August 29, 1986, defendant Raytheon purchased a license for a single-user, stand alone PC-compatible version of Airframe's Maintenance and Engineering software.

9. Airframe's Maintenance and Engineering software enables users to regulate, manage and evaluate the servicing and maintenance of airliner fleets, at the time an essential component of Raytheon's business.

10. In addition to the initial purchase price, Raytheon agreed to pay an annual renewable license fee of Ten Thousand dollars ($10,000) for the Maintenance and Engineering suite.

11. The license agreement provided that Raytheon obtained a

"non-exclusive license to use AIRLINE RESOURCE MANAGEMENT SYSTEM Software products…in machine readable form *on a single minicomputer system*, designed as an IBM System 34, IBM System 36, or a Honeywell DPS6 Series or a plug compatible mainframe running under DOS or MVS."

12. Pursuant to this license, Raytheon acquired the right to operate the ARMS software on a single user, stand alone PC-compatible computer.

13. Raytheon neither licensed nor acquired any other rights from Airframe.

14. On or about March 8, 2002, L-3 acquired the assets of Raytheon's Aircraft Integration Systems, a/k/a E-Systems Division, the division of Raytheon that had licensed Airframe's Maintenance and Engineering Suite.

15. L-3 paid $1,148,700,000 for this acquisition.

16. Following such acquisition, L-3 became the successor licensee of the Maintenance and Engineering suite.

17. Throughout its relationship with Airframe, Raytheon (and later L-3) paid for and licensed the Maintenance and Engineering suite only for a single user, stand alone PC-compatible computer.

18. In or about September 2000, Raytheon purchased a license to an NT Version of the Maintenance and Engineering Suite.

19. The NT Version license was expressly conditioned on its being "as *currently* licensed".  See NT Version license invoice, September 12, 2000, annexed hereto [emphasis added].  The only software "*currently* licensed" to Raytheon at that time (and at any other time) was for the single-user, stand alone machines referred to in Raytheon's original August 29, 1986 license.  The limitation of the NT Version license to the "*currently* licensed" program was to restrict use of the NT Version to the original single-user, stand alone license; the NT Version license conveyed no license for use of the Maintenance and Engineering Software on a network computer, including the Netfinity computer.

20. At no time did either Raytheon or L-3 contract for, pay for or license from Airframe any other upgrade or modification to the licensed software or acquire any rights to any other version of the Maintenance and Engineering software.

21. Beginning in or about September 2000, defendant Raytheon placed the licensed software on a network computer in violation of Raytheon's license for a single user, stand alone computer; Airframe learned of such violation on or about October 1, 2008 when it received a sworn statement from L-3 asserting use of the licensed software on an IBM Netfinity network computer from September 2000 through at least May 31, 2006.

22. A network computer allows independent workstations to simultaneously operate the licensed software on separate micro-processors and enables separate users to cross communicate; such functions are not available on the single user, stand alone computer for which Raytheon had licensed the Airframe software.

23. Raytheon at no time had a license to use Airframe's software on a network computer which enhances the utility and value of the licensed software from a single user, stand alone computer.

24. L-3 continued to use the licensed software on a network computer after L-3 acquired Raytheon's E-Systems division in March 2002.

25. L-3 has acknowledged that it continued to use the licensed software on the network computer through at least May 31, 2006.

### COUNT I
(Copyright Act, 17 U.S.C. §504, *et seq.* v. Ratheon)

26. Each and every allegation set forth above is repeated herein as if more fully set forth below.

27. Airframe has registered the licensed software under United States copyright laws.

28. Copyright registration certificates for the source code bear registration numbers 137065044, 137065022, 137065033, 136193581, 137065055, 137065011.

29. The license agreement for Airframe's Maintenance and Engineering software conveyed no right or license to use the software on a network computer.

30. Raytheon's use of the licensed software on a network computer violated the license agreement and infringed on Airframe's rights as the copyright holder.

31. Because of its enhanced value and utility, Airframe would not authorize its licensed software for use on a network computer without payment of a license fee and annual royalty substantially in excess of the license fee and royalty for a single user, stand alone computer.

32. Raytheon paid no license fee for, and made no agreement to use, Airframe's licensed software on a network computer.

33. Raytheon is liable in compensatory damages premised upon a reasonable license fee and annual renewal royalty to Airframe for network use of the licensed software, pursuant to the Copyright Act, 17 U.S.C. 504, along with punitive damages, attorney's fees, interest and cost of suit.

## COUNT II
(Copyright Act, 17 U.S.C. §504, *et seq.* v. L-3)

34. Each and every allegation set forth above is repeated herein as if more fully set forth below.

35. L-3 without right or license used Airframe's licensed software on a network computer from March 8, 2002, when it acquired Raytheon's E-Systems division, through at least May 31, 2006.

36. L-3's use of the licensed software on a network computer violated the license agreement and infringed on Airframe's rights as the copyright holder.

37. Because of its enhanced value and utility, Airframe would not authorize its licensed software for use on a network computer without payment of a license fee and annual royalty substantially in excess of the license fee and royalty for a single user, stand alone computer.

38. L-3 paid no license fee for, and made no agreement to use, Airframe's licensed software on a network computer.

39. L-3 is liable in compensatory damages premised upon a reasonable license fee and annual renewal royalty to Airframe for network use of the licensed software, pursuant to the Copyright Act, 17 U.S.C. 504, along with punitive damages, attorney's fees, interest and cost of suit.

### **COUNT III**
(Common Law Fraud Claims v. Raytheon)

40. Each and every allegation set forth above is repeated herein as if more fully set forth below.

41. At no time from September 2000 through March 8, 2002 did Raytheon disclose to Airframe that Raytheon was using Airframe's licensed software on a network computer. Raytheon concealed such use from Airframe while repeatedly renewing its license agreement for the single user, stand alone computer. In or about September 2002, without any disclosure to Airframe, Raytheon abandoned its use of the licensed software

on the single user, stand alone computer and began its *un*licensed, *un*authorized and *un*paid use of the Airframe software on a network computer.

42. During each license renewal period from September 2000 through March 8, 2002, Raytheon contracted for the average annual sum of ten thousand dollars ($10,000) to Airframe for annual renewals of the single user, stand alone IBM 36PC-compatible Maintenance and Engineering Suite that Raytheon had licensed from Airframe without disclosing its use of the licensed software on a network computer.

43. Airframe repeatedly accepted and/or agreed to said consideration by Raytheon for said license renewals based upon the understanding that Raytheon was using the licensed software on a single user, stand alone computer.

44. At no time from September 2000 through March 8, 2002 did Raytheon disclose to Airframe that Raytheon was using the licensed software on a network computer.

45. Raytheon's failure to make such disclosure is an omission of a material fact that induced Airframe to accept substantially less money for the annual license renewals than it would have if Airframe had known of Raytheon's actual use of the licensed software on a network computer.

46. The use of Airframe's licensed software on a network is of substantially more value and utility to Raytheon than the use of the licensed software on a single user, stand alone computer; network use of the licensed software enables multiple users to operate the licensed software simultaneously and permits cross communication between workstations, functions not available through a stand alone machine.

47. Airframe would have sought a license fee and also substantially higher consideration for the annual renewals if it had known that Raytheon had used Airframe's licensed software on a network computer.

48. Raytheon's failure to disclose in connection with these renewals that it was using Airframe's licensed software on a network computer induced Airframe to negotiate and/or accept renewal fees based upon the reasonable value of the IBM 36PC-compatible version of the Maintenance and Engineering Suite on a single user, stand alone computer which was substantially and materially less than the reasonable license and royalty value of the licensed software when operated on a network computer.

49. Airframe relied on such omissions in its acceptance of the ten thousand dollar annual renewal license for the licensed software and in its failure to demand a license fee for the network use of the licensed software.

50. Airframe was damaged by such omissions through the loss of the license fee and annual renewals for the network use of its software.

51. Accordingly, Raytheon is liable in fraud to Airframe for the reasonable license fee and annual renewal royalties for the network use of the Maintenance and Engineering software for the period September 2000 through March 8, 2002, along with punitive damages, interest, cost of suit and attorneys fees.

## COUNT IV
### (Common Law Fraud Claims v. L-3)

52. Each and every allegation set forth above is repeated herein as if more fully set forth below.

53. At no time from March 8, 2002 until October 1, 2008 did L-3 disclose to Airframe that L-3 was using Airframe's licensed software on a network computer.  Such

use was concealed from Airframe by L-3 which, in addition to infringement, engaged in a pattern of deception as to its actual use of the licensed software.  L-3 knowingly refused to make disclosure of such infringing use, intentionally acted in a manner to deceive Airframe and evidenced a knowing intent to violate its license with Airframe.

54. During each license renewal period from March 8, 2002 through at least May 31, 2006, L-3 contracted for the average annual sum of ten thousand dollars ($10,000) to Airframe for annual renewals of the single user, stand alone IBM 36 PC-compatible Maintenance and Engineering suite.

55. Airframe repeatedly accepted and/or agreed to said consideration by L-3 for said license renewals based upon the understanding that L-3 was using the licensed software on a single user, stand alone computer.

56. L-3's failure to disclose its repeated use *over a six year period* of the licensed software on a network computer is an omission of a material fact that induced Airframe to fail to demand a license fee for network use of its software and to accept substantially less money for the annual license renewals than it would have if Airframe had known of L-3's actual use of the licensed software on a network computer.

57. The use of Airframe's licensed software on a network computer is of substantially more value and utility to L-3 than the use of the licensed software on a single user, stand alone computer; network use of the licensed software enables multiple users to operate the licensed software simultaneously and permits cross communication between workstations, functions not available through a stand alone machine.

58. Airframe would have sought a license fee and substantially higher consideration for the annual renewals if it had known that L-3 had used Airframe's licensed software on a network computer.

59. L-3's failure to disclose in connection with these renewals that it was using Airframe's licensed software on a network computer induced Airframe to negotiate and/or accept renewal fees based upon the reasonable value of the Maintenance and Engineering suite on a single user, stand alone computer which was substantially and materially less than the reasonable license and royalty value of the licensed software when operated on a network computer.

60. Airframe relied on such omissions in its acceptance of the ten thousand dollar annual renewal license for the licensed software and in its failure to demand a license fee for the network use of the licensed software.

61. Airframe was damaged by such omissions through the loss of the license fee and annual renewals for the network use of its software.

62. By such omissions L-3 fraudulently induced Airframe to permit L-3 to succeed to the Raytheon license without payment of a starting license fee for the network use of the NT Version.  Airframe would not have waived L-3's payment of a starting license fee had it known that L-3 was using the NT Version on a network computer.

63. Accordingly, L-3 is liable in fraud to Airframe for the reasonable license fee and annual renewal royalties for the network use of the Maintenance and Engineering software for the period March 8, 2002 through at least May 31, 2006, along with punitive damages, interest, cost of suit and attorneys fees.

## COUNT V
(Alternative Fraud Claim v. L-3, as successor to Raytheon)

64. Each and every allegation set forth above is repeated herein as if more fully set forth below.

65. In the alternative, L-3 is liable as successor-in-interest to Raytheon's E-Systems division for Raytheon's fraudulent omissions and misrepresentations.

66. Accordingly, in the alternative L-3 is liable as successor in interest in compensatory damages for Raytheon's fraudulent omissions and misrepresentations, along with punitive damages, interest, cost of suit and attorneys fees.

## COUNT VI
(Alternative Copyright Act, 17 U.S.C. §504, *et seq.* v. L-3,
as successor to Raytheon)

67. Each and every allegation set forth above is repeated herein as if more fully set forth below.

68. In the alternative, L-3 is liable as successor-in-interest to Raytheon's E-Systems division for Raytheon's infringement and violation of the license agreement.

69. Accordingly, in the alternative L-3 is liable in compensatory damages premised upon a reasonable license fee and annual renewal royalty to Airframe for Raytheon's network use of the licensed software from September 2000 through March 8, 2002, pursuant to the Copyright Act, 17 U.S.C. 504, along with punitive damages, attorney's fees, interest and cost of suit.

WHEREFORE, plaintiff seeks judgment against defendants as follows:

1) On Count I against Raytheon for violation of the Copyright Act, 17 U.S.C. §504, *et seq.* for compensatory damages in an amount equal to a

reasonable license fee and annual royalties, along with punitive damages, interest, attorney's fees and cost of suit;

2) On Count II against L-3 for violation of the Copyright Act, 17 U.S.C. §504, *et seq.* for compensatory damages in an amount equal to a reasonable license fee and annual royalties, along with interest, attorney's fees and cost of suit;

3) On Count III against Raytheon in fraud for compensatory and punitive damages, along with interest, attorney's fees and cost of suit;

4) On Count IV against L-3 in fraud for compensatory and punitive damages, along with interest, attorney's fees and cost of suit;

5) On Count V in the alternative against L-3 as a successor in interest to Raytheon in fraud for compensatory and punitive damages, along with interest, attorney's fees and cost of suit;

6) On Count VI in the alternative against L-3 as successor in interest to Raytheon in compensatory damages premised upon a reasonable license fee and annual royalties pursuant to the Copyright Act, 17 U.S.C. §504, *et seq.* along with punitive damages, interest, cost of suit and attorneys fees.

WHEREFORE, plaintiff respectfully requests that judgment be entered on the foregoing causes of action and for such additional relief as to the Court may seem just and proper.

## **DEMAND FOR JURY TRIAL**

Airframe hereby demands a trial by jury as to all issues so triable.

                                         AIRFRAME SYSTEMS, INC. f/k/a/
                                         Airline Software, Inc.
                                         By its attorneys,

                                         / S / Peter B, Krupp

Dated:  November 20, 2008         Peter B, Krupp
                                            B.B.O. #548112
                                        Lurie & Krupp, LLP
                                        One McKinley Square
                                        Boston, MA 02109
                                        Tel:  617-367-1970

                                        Bruce I. Afran
                                          NJ BA 8583
                                        10 Braeburn Drive
                                        Princeton, New Jersey 08540
                                        Tel:  609-924-2075