UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

AIRFRAME SYSTEMS, INC. f/k/a
AIRLINE SOFTWARE, INC.,

      Plaintiff,

  v.

RAYTHEON COMPANY
and
L-3 COMMUNICATIONS CORPORATION,

      Defendants.

Case No. 1:08-cv-11940-WGY

## L-3'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Fed. R. Civ. P. 56 and L.R. 56.1, L-3 Communications Corporation ("L-3") submits the following undisputed facts:

**The Court's Sanctions Order**

1. The Court's May 13, 2010 Order excludes from the case the testimony of Steven Gans, Airframe's technical expert. (D.I. 69 and May 13, 2010 Court Order).

2. The Court's May 13, 2010 Order limits Airframe's theories and proof of infringement to that disclosed in its response to L-3's Interrogatory No. 3. (Kessel Decl. Ex.16, and May 13, 2010 Court Order).

3. Airframe has admitted L-3's Requests for Admission as a result of the Court's May 13, 2010 Order. (D.I.72-21 (Appendix A to Kessel Declaration) and May 13, 2010 Court Order).

**4.** The Court's May 13, 2010 Order prohibits reconsideration of the source code. (May 13, 2010 Court Order).

**Airframe's ARMS Product**

5. Airframe began developing aircraft maintenance tracking software known as Airline Resource Management System ("ARMS") in 1979 (Kessel Decl. Ex. 3 ¶ 11).

6. Over the years, Airframe has continually modified and upgraded the ARMS source code. (Kessel Decl. Ex. 3 ¶ 13).

7. ARMS is written in the RPG computer language (Frederiksen Decl. ¶ 5).

8. The RPG computer language was originally created as a report-writing tool in 1959, as a high-level programming language most often used for business applications. (Frederiksen Decl. ¶ 6).

9. Airframe does not preserve notes and records of changes to the ARMS source code over time. Airframe does not preserve documentation of any changes to ARMS source code after such changes are incorporated into the source code. (Kessel Decl. Ex. 17).

10. Airframe produced only the current (2009) version of its ARMS source code for inspection in this litigation. (Frederiksen Decl. ¶ 9).

11. The current (2009) version of Airframe's ARMS source code differs from the partial version left on a Raytheon computer by John Stolarz in the late 1990's. (Kessel Decl. Ex. 18 and May 13, 2010 Court Order).

12. The current (2009) version of Airframe's ARMS source code differs from the source code subject to any of its six copyright registrations. (Kessel Decl. Ex. 18 and May 13, 2010 Court Order).

**John Stolarz Leaves Airframe Files on a Raytheon Computer**

13. John Stolarz was employed by Airframe from 1983 to 2001. (Kessel Decl. Ex. 3 ¶ 6).

14. Mr. Stolarz visited Raytheon's Greenville, Texas office in the late 1990's to perform maintenance on Airframe's software. (*Airframe Systems, Inc. v. Raytheon Co.*, 601 F.3d 9, 12 (1st Cir. 2010))

15. During Mr. Stolarz's maintenance visit in the late 1990's, he left several Airframe files on the Raytheon computer, including source code files. (*Airframe Systems, Inc. v. Raytheon Co.*, 601 F.3d 9, 12 (1st Cir. 2010))

16. Airframe President Gordon Rosen discovered the Airframe files left by Mr. Stolarz on the Raytheon computer in August 2003 while he was accessing that computer remotely. (Kessel Decl. Ex. 8).

17. When Mr. Rosen discovered the Airframe files in August 2003, L-3 employee Hector Arce was observing Mr. Rosen's remote access and speaking with Mr. Rosen on the phone. (Kessel Decl. Ex. 8).

18. When Mr. Rosen asked Mr. Arce to delete the Airframe files, Mr. Arce created a screen image showing the list of files and then deleted those files. (Kessel Decl. Ex. 8)

19. The screen image created by Mr. Arce reflects that Mr. Stolarz left a total of seventy-one files. The filenames for those files are attached as Exhibit 9 to the Declaration of Adam J. Kessel. (Kessel Decl. Ex. 9.)

20. Aside from the seventy-one files left on L-3's computer by Mr. Stolarz in the late 1990's, ASI has offered no evidence of L3IS actual possession of Airframe source code. (Frederiksen Decl. ¶ 8).

21.     Airframe has not produced in this case a copy of the seventy-one files Mr. Stolarz left on a Raytheon computer in the late 1990's. (Frederiksen Decl. ¶ 13).

**L-3's M3 Product**

22.     Beginning in January 2004, the Proprietary Programs group began creation of software to track aircraft maintenance functions called "M3." (Kessel Decl. Ex. 12).

23.     M3 was created under a contract with the Proprietary Programs group's sole customer, the 645th Aeronautical Systems Group of the United States Air Force. (Kessel Decl. Ex. 5 and Kessel Decl. Ex. 21).

24.     M3 was created in an iterative process involving maintenance supervisor Sharon Poelman and software developer Brett Pelham. (Kessel Decl. Ex. 13 at 67:15 – 71:1. 90:13-14)

25.     Mr. Pelham never had access to Airframe's ARMS source code. (Kessel Decl. Exs. 8 and 12).

26.     M3 was put into operation at L-3 on June 1, 2006, after the last annual license for ARMS software expired and was not renewed and the hard drive on which ARMS was installed was destroyed per L-3 security protocol. (Kessel Decl. Ex. 8).

27.     M3 was created in a web-based computer language known as PHP. (Frederiksen Decl. ¶ 5).

28.     The PHP computer language is a web-based language that first appeared in 1995 and became widely used in the following decade for web applications. (Frederiksen Decl. ¶ 6).

29.     Mr. Pelham developed a process for exporting all aircraft maintenance data stored in ARMS to "flat" text files. Those historical data were then imported into M3 to insure continuity. (Kessel Decl. Ex. 13 at 91:1-25.)

**Airframe's Failure of Proof of Infringement**

30.     Airframe has not shown the contents of the seventy-one files Mr. Stolarz left on a Raytheon computer in the late 1990's.  (Frederiksen Decl. ¶ 13).

31.     Airframe has not disclosed any alleged infringement from the seventy-one files Mr. Stolarz left on a Raytheon computer in the late 1990's.  (Frederiksen Decl. ¶ 5).

32.     Airframe has not disclosed any side-by-side comparison between, on the one hand, the contents of the seventy-one files Mr. Stolarz left on a Raytheon computer in the late 1990's, and, on the other, the source code to M3.  (Frederiksen Decl. ¶ 12).

33.     Airframe has not shown the contents of the source code subject to any of its six copyright registrations.  (Frederiksen Decl. ¶ 9).

34.     Airframe has not disclosed any side-by-side comparison between the source code subject to any of its six copyright registrations and any L-3 source code.  (Frederiksen Decl. ¶ 12).

35.     Airframe has not disclosed any side-by-side comparison between any Airframe source code and any L-3 source code.  (Frederiksen Decl. ¶ 12).

**Airframe's Failure of Proof of Damages**

36.     Airframe never charged L-3 or its predecessors more than $10,000 annually for a license to the ARMS software over the more than twenty year relationship between the companies. (Ex. 19 159:11-17) This history was not included in the ASI damage calculation. (*Id*. 190: 11-15)

37.     The ASI damage calculation was based on the L-3 2008 10K report of $2.657 billion of net sales revenues for the AM&M Reportable Segment. (Ex. 19 137 21-25; Ex.7 at 8)

38.     Airframe's license fee for use of the ARMS software by L-3 or its predecessors was never based on the user's revenue. (Ex. 19, 324: 6-25)

39.     The payment for all Airframe licenses to the ARMS software on which its expert based his damage conclusion were based on a fixed, lump-sum payments for the package of software being licensed. No such Airframe license was based on the customer's revenue. (*Id*. 324: 15-325:5.)

40.     There is no evidence in the record that the airline industry typically licenses aircraft maintenance software based on a customer's net revenue. ASI's expert witness testified that his damage calculation did not reflect typical licensing practices in the airline industry. (Ex. 19, 334: 14-15.)

41.     M3 has been used by L-3 only within the Proprietary Programs unit of L-3's Mission Integration Division and only for its government customer. (Ex. 21.)

42.     L-3's Mission Integration Division does not report revenue through L-3's AM&M reportable segment in L-3's 10k filings. (Ex. 21 ¶¶ 2-5.)

43.     M3 has never been used by any business unit reporting revenue through L-3's AM&M reporting unit. AM&M businesses use commercial, military or proprietary software to track aircraft maintenance – not M3. (Ex. 21 ¶¶ 2-16.)  Net Revenues reported by L-3's AM&M reportable segment in the L-3 2008 10K did not include revenues generated by use of M3. (*Id.*)

44.     The Proprietary Programs unit performs work for a single government customer, the 645th Aeronautical Systems Group of the United States Air Force. (Ex. 21, ¶ 2.)

45.     The Proprietary Programs unit tracks maintenance requirements on fewer than twenty aircraft for its sole government customer. (Ex. 5 ¶ 7.) ASI's damage report states that the L-3 license fee was based on record keeping for four aircraft. (Ex. 7 at 17 ¶ 15.)

46.     Proprietary programs had two annual contracts with its government customer relating to aircraft maintenance tracking since April 2009.  One contract was to maintain and upgrade M3,

the other to perform maintenance tracking for the small number of aircraft in the government customers program. Revenues from these contracts were $569,606 and $1,909,554 respectively ($2,479,160), resulting in profits of $88,952 and $415,991, a total of $504,943. (Ex. 5 ¶ 6, Exs. C and D.)

47. Airframe's expert witness made no calculation of damages for the period April 7, 2010. (Ex. 19, 109:2-4; 15-17.)

48. Airframe's expert witness made no calculation of profits based on use of M3. (Ex. 8 at 16 ¶ 13.)

49. Airframe's expert witness made no calculation of actual damages based on use of M3. He testified that his report assumes AM&M businesses used M3 because he used AM&M revenues as the basis of his calculation (Ex. 19; 146:6-10.)

50. Airframe's expert witness made no separate calculations of actual damages and profits based on actual use of M3. (*Id.*)

51. Airframe's expert witness expressed no conclusion which identified his calculation of damages as representing the product of a hypothetical negotiation between ASI and L-3 among the four methodologies his report discussed. (Ex. 7 at. 17-22.)

52. Airframe's conclusion as to damages did not include the revenue and profit figures provided by L-3 based on actual use of M3 by Proprietary Programs. (Ex. 5 ¶ 6, Ex. 20.)

Dated:  May 17, 2010                                        /s/ Adam J. Kessel
                                                               Kurt L. Glitzenstein (BBO # 565312)
Adam J. Kessel (BBO # 661211)
Danni Tang (BBO# 669563)
FISH & RICHARDSON P.C.
225 Franklin Street
Boston, MA  02110-2804
(617) 542-5070 Telephone
(617) 542-8906 Facsimile

Attorneys for Defendant
L-3 Communications Corporation

Of Counsel

Alan M. Gelb (AG 4254) admitted *pro hac vice*
Kirstin Peterson (KP 6850)
JONES HIRSCH CONNORS & BULL P.C.
Attorneys for Defendant
L-3 Communications Corporation
One Battery Park Plaza
New York, New York 10004
Phone: (212) 527-1000
FAX: (212) 527-1680