UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

--------------------------------------------------------

AIRFRAME SYSTEMS, INC. f/k/a
AIRLINE SOFTWARE, INC.,

        Plaintiff,

                            Case No:  1:08-cv-11940-WGY

        v.

RAYTHEON COMPANY and
L-3 COMMUNICATIONS  CORPORATION,

        Defendants.

--------------------------------------------------------

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

Plaintiff Airframe Systems, Inc. ("Airframe") submits this memorandum in opposition to the motion by defendant L-3 Communications Corporation ("L-3") seeking summary judgment (Docket # 81) and in support of Airframe's cross-motion for summary judgment filed herewith

Statement of Undisputed Facts

Airframe Systems, Inc. (Airframe) is a maker of aircraft maintenance software (ARMS) that is protected by continuing copyright registrations.  Complaint ¶¶ 74-75.

Airframe licensed its PC-version of ARMS to a predecessor of Raytheon Company (Raytheon) in 1986 that was been continuously renewed by Raytheon and L-3 until May 2006. Complaint ¶¶ 11-19, 33-43.

Neither L-3 nor Raytheon had any license to the Airframe source code for any purpose. *See* Certification of Gordon Rosen dated January 20, 2006 at ¶ 16, annexed as Exhibit A to Certification of Alan Gelb, September 29, 2008.

L-3 contends that a former employee of Airframe, John Stolarz, installed the source code on L-3's computer.  Complaint ¶52.

Stolarz had no authority to give the source code to L-3 or Raytheon which had not purchased it or obtained a license to it.  Complaint ¶¶ 56, 59-63; Rosen Certification, Exhibit A to Gelb Certification, at ¶¶ 26-28.

The use of the AS400 software derived from Airframe's source code violated Airframe's copyrights.  Complaint ¶¶ 57-63,66,77,80,81,88; Rosen Certification at ¶ 5.

L-3 used the ARMS source code to gain development time and product stability that was not available through the development of software from the ground up in the PHP language. Declaration of Gordon S. Rosen in Opposition to L-3's Motion for Summary Judgment and in Support of Airframe's Cross Motion for Summary Judgment (June 7, 2010) ("Rosen Aff.") ¶¶ 10-11, 21, 22.

The ARMS ZFLSQWK file was copied by L-3.  Rosen Aff. ¶¶ 16, 18.  The ARMS SQRDAT data element was copied by L-3.  Rosen Aff. ¶¶ 17, 18.

The ARMS sq_flight_num and sq_ata data elements were copied by L-3.  Rosen Aff. ¶ 20.  L-3 copied between 580 and 600 files from the ARMS source code.  Rosen Aff. ¶¶ 21, 22, 58.

L-3's M3 program contains "create" and "modify" dates prior to 2004, when L-3 said it began developing M3, indicating that M3 was taken from an earlier source code.  Rosen Aff. ¶¶ 24.

The only other source code L-3 admits to having access to is the ARMS source code and it was the ARMS source code that L-3 accessed in creating M3.  Rosen Aff. ¶ 25.

Screens from M3 match the ARMS screens and are identical.  Rosen Aff. ¶ 28.

L-3 admits that it copied and uploaded the ARMS screens and report formats into the M3 program.  Rosen Aff. ¶ 31.

Brett Pelham included comments in M3 that demonstrate he had access to the ARMS source code.  Rosen Aff. ¶ 31.

Lines 1094-1284 of the M3 code is a copy of the ARMS program ZIS010.  Rosen Aff. ¶ 34.

M3 copies the ARMS hypenated "RE-SET" file.  Rosen Aff. ¶ 34.

M3 copies the ARMS "ONE-TIME" field name.  Rosen Aff. ¶ 35.

M3 copies the ARMS "INCLUDE ON TASK CARD TIE IN" function.  Rosen Aff. ¶ 36.

M3 copies the ARMS "PN (IF PN BASED)" function and the ARMS "Perform every", "early window", "late window", "Repeat every" sequence and followed by the ARMS three columns structure for "Hours   Cycles   Days".  Rosen Aff. ¶ 37.

M3 code lines 1163 to 1164 contain the statement "cannot determine use for capability in to not reset," indicating that the M3 designer used other source code that he did not understand. Rosen Aff. ¶ 38.

At M3 code lines 1549-1613 appears the INSPECTION RE-SET function that is almost exact copy of ZIS080, the ARMS INSPECTION RE-SET function.  Rosen Aff. ¶ 39.

At M3 code lines 167-175 appeared the "Kit_Browser.php" module containing the sequence "BASIC PART, ASSEMBLY, SUB-ASSSEMBLY, ENGINE, KIT PART" the exact duplicate of the same sequence in ARMS and which is unique to ARMS. Rosen Aff. ¶ 40.

Lines 1549-1558 of the M3 code shows schemas that are lifted from the ARMS file: ZFLACTYI.RPG, ZFLINPC.RPG and ZFLACTYR.RPG.  Rosen Aff. ¶ 41.

M3 lines 584-826 are in the module inspection_forms.php that is an exact copy of the ARMS program ZIS090.  Rosen Aff. ¶ 42.

Lines 4161-4171 of the M3 address the use of the table of Receipt Codes that is an exact copy of the ARMS list using the ARMS sequence in identical order with identical numbers attached.  Rosen Aff. ¶ 43.

Lines 4291-4358 of M3 code referencing the INQUIRE TIME APPLIED TO AIRCRAFT function are an exact copy of the ARMS equivalent ZRT060 including the same code and sequence.  Rosen Aff. ¶ 43.

M3 code lines 3559-3632 and 3639-3668 that define the table schema for the serial and part masters are identical to the ARMS files of ZFLRSC1.RPG and ZFLRSC0.RPG.  Rosen Aff. ¶ 44.

M3 code lines 3798-3802 define the list of part status codes for "IN STOCK, ON AIRCRAFT, IN SUSPENSE, etc"; this was a list created for the ARMS program and the M3 version uses code letters as used by ARMS: I for IN STOCK, P for ON AIRCRAFT, S for IN SUSPENSE or QUARANTINE, etc.  Rosen Aff. ¶ 44.

Lines 1096-1314 of the M3 code define the ROTABLE PART MASTER screen that is the exact copy of the ARMS programs ZRT020.  Rosen Aff. ¶ 46.

M3 schema for the inspection data come from the ARMS file ZFLACTYI.RPG.  Rosen Aff. ¶ 47.

Menu entries such as "Batch, Keyword, Part # Search, and Rotable Chain List" are unique to ARMS and appear in M3.  Rosen Aff. ¶ 49.

M3 uses the same six-character menu/file names as ARMS even though the PHP language in which M3 is written does not have a six-character limitation, as does the ARMS RPG-II language.  <u>Rosen Aff</u>. ¶ 49.

Menu CMPSUP was copied intact from ARMS to M3 but L-3 renumbered the menu item to conceal the copying.  <u>Rosen Aff</u>. ¶ 50.

M3 uses the ARMS menu "UPDATE KITS/ENGINES/ASSEMBLIES" even though this is usually referred in the industry as "Bill of Materials".  <u>Rosen Aff</u>. ¶ 50.

Industry uses function "K/E/A" but M3 copies the ARMS "KAE".  <u>Rosen Aff</u>. ¶ 50.

L-3's M3 reports or screens were uploaded and copied from the ARMS program as admitted by Brett Pelham in his deposition testimony.  <u>See</u> <u>Rosen Aff</u>., Exhibit 5 at 89-92.

The following M3 reports/screens are copies of the ARMS reports/screens, with the page numbers listed below corresponding to the pages of <u>Rosen Aff</u>., Exhibit 1:

| L3 BATES NUMBER | PAGE NBR | ARMS PROGRAM/SCREEN NAME | FUNCTION |
|---|---|---|---|
| a. L3IS – MA2 09827 | 1 - 4 | ZMN050 / SCRN02 | SQUAWK ADD |
| b. L3IS – MA2 09828 | 5 - 7 | ZMN050 / SCRN03 & 04 | SQUAWK INQUIRY |
| c. L3IS – MA2 03392 | 8 - 11 | ZMN065 | SQUAWK REPORT |
| d. L3IS – MA2 03280 | 12 - 14 | ZMN190 | RELIABILITY UTILIZATION REPORT |
| e. L3IS – MA2 03405 | 15 - 17 | ZMN190 | AIRCRAFT UTILITZATION SUMMARY |
| f. L3IS – MA2 03273 | 18 - 20 | ZMN075 | NON-SCHEDULED COMPONENT REMOVALS |
| g. L3IS – MA2 03276 | 21 - 24 | ZMN065 | MMM  SQUAWK REPORT |
| h. L3IS – MA2 03401 | 25 - 28 | ZRT020 | MMM TIME APPLIED TO AIRCRAFT REPORT |
| i. L3IS – MA2 03397 | 29 - 32 | ZRS835 | MMM KIT REPORT |
| j. L3IS – MA2 09804 | 33 - 35 | ZRT240 / SCRN02 | M3  ROTABLE CHAIN LIST REPORT SELECTION |
| k. L3IS – MA2 0980 | 36 - 38 | ZRT241 | MMM ROTABLE CHAIN LIST |
| l. L3IS – MA2 09814 | 39 - 41 | ZRT060 / SCRN01 | TIME  APPLIED TO  AIRCRAFT INQUIRY |
| m. L3IS – MA2 03402 | 42 - 44 | ZIS015 | M3  AIRCRAFT TYPE  INSPECTION NAMES |
| n. L3IS – MA2  03399 | 45 - 48 | ZIS105 | M3 INSPECTION REPORT |
| o. L3IS – MA2  03400 | 49 - 51 | ZIS040 | M3 INSPECTION RESULTS |
| p. L3IS – MA2 03396 | 52 - 54 | ZRT045 | M3 [redacted] PARTS |

5

| | | | PROJECTION by DATE |
|---|---|---|---|
| q. L3IS – MA2 03393 | 55 - 59 | ZRT241 | M3 [redacted] ROTABLE PARTS LIST |
| r.  L3IS – MA2 03275 | 60 - 63 | ZMN125 | COMPONENTS BY ATA CHAPTER |
| s.  L3IS – MA2 03395 | 64 - 66 | ZRS825 | ADD/UPDATE ATA CODES |
| t.  L3IS – MA2 09806 | 67 - 69 | ZRS030 / SCRN04 | PART SEARCH BROWSER |
| u. L3IS – MA2 03394 | 60 - 72 | ZMN025 | M3 AIRCRAFT MAINTENANCE HISTORY |
| v. l3IS – MA2 003398 | 73 - 76 | ZRS384 | M3 KIT DETAIL REPORT |
| w. L3IS – MA2 03259 | 77 - 80 | ZRT045 | PROJECTION OF INSPECTIONS/  COMPONENTS |
| x. L3IS – MA2 09816 | 81 - 85 | INVENT, MAINT, CMPCTL, INSPEC | MMM – MAIN MENU menus |

See Rosen Aff. ¶ 58 and Exhibit 1.

Non-ARMS vendors use different organizational methods for reports and screens and different creative input.  Rosen Aff. ¶¶ 52-57, 59, 60.

ARMS use of "Reference Number" referring to Squawk reports is a unique adoption that differs from the industry usage.  Rosen Aff. ¶ 61a.

M3 copies the ARMS use of "Squawk Type" report to allow the user to separate Squawks reported by cockpit crew, cabin crew, and mechanics while the aviation industry at large tracks only "Pilot Squawks".  Rosen Aff. ¶ 61b.

ARMS use of the "presentation" sequence allows the user to trace the flow of events visually, a unique creation not used by other vendors as demonstrated by the examples from LIAT that use a different function.  Rosen Aff. ¶ 61c.

ZMN190 and ZMN065 are fanciful terms invented by Airframe directly copied by L-3 in the M3.  Rosen Aff. ¶¶ 61d, 61g.

ARMS uniquely keeps track of the number of adjustments made to an "Apply Time" record *already* made while the rest of the industry keeps *multiple* records for each new change, a unique approach taken only by Airframe.  Rosen Aff. ¶61h.

M3 copies the ARMS These Kit reports except for the use of an underscore, i.e., "_" where ARMS uses a "greater than" symbol.  <u>Rosen Aff</u>. ¶ 61i.

M3 copies "Rotable Chain List" a unique term used only by ARMS.  <u>Rosen Aff</u>. ¶ 61j.

M3 copies ARMS segregation of Rotable Chain reports by "Hard Time" and "Condition" while the industry does not use such segregation.  <u>Rosen Aff</u>. ¶ 61j.

ARMS three-level stacking system for "times" elements is a unique organizational tool used only by ARMS and copied by M3.  <u>Rosen Aff</u>. ¶ 61k.

M3 copies ARMS' use of a "Days" entry column for "Apply Time" programs, a feature not used by the industry.  <u>Rosen Aff</u>. ¶ 61l.

M3 copies the terms "Perform Every" and "Repeat Every" that are unique to ARMS which supports both inspection intervals for initial "performance" *and* for "repeat" intervals, a function directly copied by M3.  <u>Rosen Aff</u>. ¶ 61m.

M3 copied the ARMS ZIS040, ZRT045, ZRT241, ZMN125, ZMN025, ZRS384, ZRT045 reports with no substantive change.  <u>Rosen Aff</u>. ¶¶ 61o, p, q, r, s, u, v and w.

L-3 uses proprietary maintenance software in its AM&M division using the WECMS and BED programs, in addition to the M3 program.  Arce Transcript, relevant pages of which are attached as Exhibit 1, ("Arce Transcript") at 93-95.

L-3's proprietary aviation software is not limited to the MID division.  <u>Id.</u>

L-3 has never denied that it uses software related or derived from the same source code as M3 in units other than the MID; its certifications make no denial of such facts.  <u>See</u> Arce Certification (Mar. 12, 2010) and Spivey Certification (Mar. 12, 2010), attached as Exhibits 5 and 6 to defendant's motion.

Damages for lost profits or reasonable royalty are based on the AM&M, the entire revenue sector of L-3 that engages in aircraft maintenance.  Chodor Report at 14-23, attached as Exhibit 7 to defendant's motion.

L-3's Rule 30(b)(6) witness as to damages, Hector Arce, stated that he has no knowledge of aircraft maintenance usage in the entire AM&M unit and has provided no basis for limiting the damage claim.  Arce Transcript at 56-60, 66-67, 144-146.

Airframe's claim of damages $33,592,000 per annum is within the scope of the accepted basis of calculating damages under *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970); Chodor Report at 23.

The AM&M division's $2.827 billion dollars in revenues in the last calendar year for which annual figures are available is an appropriate base on which to project damages for lost profits as the AM&M division uses in-house aviation maintenance software.  Chodor Report at 16; Arce Transcript at 93-95.

L-3 has failed to produce Spivey as a witness despite the Court's order and no inference can be made from Spivey's assertions as to damages as he has not been made available for testing by Airframe through deposition; Airframe has a motion pending to strike L-3's damages defenses due to its failure to produce the witness.  See Airframe's Motion for Sanctions Against L-3 Communications Corporation (Docket #80).

ARGUMENT

I.    SUMMARY JUDGMENT SHOULD BE ENTERED IN FAVOR OF
      AIRFRAME BECAUSE THE UNDISUTED EVIDENCE SHOWS THAT L-3
      HAD ACCESS TO THE AIRFRAME SOURCE CODE, UPLOADED AND
      COPIED AIRFRAME'S ARMS REPORTS AND SCREENS AND COPIED
      DATA FILES, MENUS AND OTHER ARMS SOURCE CODE.
      ALTERNATIVELY, THE FACTS DEMONSTRATE A CLEAR ISSUE OF
      FACT AS TO INFRINGEMENT AND DEFENDANT'S MOTION SHOULD
      BE DENIED.

      The law in this circuit as to the elements of infringement is clear.  "One infringes a copyright

when he or she violates one of the exclusive rights to a work held by a copyright owner, and the

owner has the right to sue for infringement." *Mass. Museum of Contemporary Art Found., Inc. v.

Buchel*, 593 F.3d 38, 48 (1st Cir. 2010).  To prevail on a copyright infringement claim, the

proponent must "prove ownership of a valid copyright and the unauthorized copying of

constituent elements of the work that are original."  *Warren Freedenfeld Assocs. v. McTigue*, 531

F.3d 38, 47 (1st Cir. 2008).  See also *Mag Jewelry Co. v. Cherokee, Inc*., 496 F.3d 108, 114 (1st

Cir. 2007). "An inference of copying may be drawn from evidence that an alleged copier had

access to the copyright holder's previously created design and that there is a high degree of

similarity between the work." *Id.* at 114-115, citing *Johnson v. Gordon*, 409 F.3d 12, 18 (1st

Cir. 2005).

      In the instant action there is no factual dispute that L-3 had access to the source code and the

report formats and screen interfaces.  L-3's own counsel, Alan Gelb, acknowledged that L-3 had

used the source on at least one occasion and it is undisputed that L-3 possessed the source code

in its computer library.  As to the report formats, interfaces and data files, L-3 has already

admitted in deposition testimony that it copied the report formats and interfaces for use in its M3

program.  See Rosen Aff., Exhibit 5 at 89-92, 105-106.  Where L-3 has acknowledged copying

the report formats and interfaces, there is no defense of "independent creation."  Cf. *Grubb v.*

*KMS Patriots, L.P.*, 88 F.3d 1, 4 (1st Cir. 1996).

Further, there is no dispute that the ARMS material was copyrighted.  As Mr. Rosen testifies, there is not only "substantial similarity," as to the report formats and interfaces, they are identical to the Airframe versions all of which are marked by a copyright notice.  <u>Rosen Aff</u>. ¶¶ 58, 61a-61x.

Mr. Rosen has expressly testified that the reports and screen interfaces are unique choices taken by Airframe that are not used by other vendors.  <u>See</u> <u>Rosen Aff</u>. ¶¶ 52-57, 59, 60.  For its part, L-3 has not answered ANY of Airframe's interrogatories or document requests seeking to substantiate L-3's affirmative defenses that such materials are not protectible or are otherwise in the public domain.

Based on this factual demonstration, there is no issue of fact as to:  (1) the use of the ARMS source code by L-3 in its creation of the so-called M3 program; and (2) that L-3 copied the reports and screen interfaces, as admitted by Mr. Pelham, all of which are subject to Airframe's copyrights.

A.  L-3's "M3" Program Uses The Exact Copies Of The ARMS Reports Generated By The ASI System.

Mr. Rosen has testified that M3 uses exact copies of the ASI reports generated by the ARMS systems, <u>see</u> <u>Rosen Aff</u>. ¶¶ 58, 61a-61x, copying the following ARMS reports into M3:

| | |
|---|---|
| ZMN050 / SCRN02 | SQUAWK ADD |
| ZMN050 / SCRN03 & 04 | SQUAWK INQUIRY |
| ZMN065 | SQUAWK REPORT |
| ZMN190 | RELIABILITY UTILIZATION REPORT |
| ZMN190 | AIRCRAFT UTILITZATION SUMMARY |
| ZMN075 | NON-SCHEDULED COMPONENT |

|  | REMOVALS |
| --- | --- |
| ZMN065 | MMM  SQUAWK REPORT |
| ZRT020 | MMM TIME APPLIED TO AIRCRAFT REPORT |
| ZRS835 | MMM KIT REPORT |
| ZRT240 / SCRN02 | M3  ROTABLE CHAIN LIST REPORT SELECTION |
| ZRT241 | MMM ROTABLE CHAIN LIST |
| ZRT060 / SCRN01 | TIME  APPLIED TO AIRCRAFT INQUIRY |
| ZIS015 | M3  AIRCRAFT TYPE INSPECTION NAMES |
| ZIS105 | M3 INSPECTION REPORT |
| ZIS040 | M3 INSPECTION RESULTS |
| ZRT045 | M3 [name redacted]  PARTS PROJECTION by DATE |
| ZRT241 | M3 [name redacted] ROTABLE PARTS LIST |
| ZMN125 | COMPONENTS BY ATA CHAPTER |
| ZRS825 | ADD/UPDATE ATA CODES |
| ZRS030 / SCRN04 | PART SEARCH BROWSER |
| ZMN025 | M3 AIRCRAFT MAINTENANCE HISTORY |
| ZMN025 | M3 AIRCRAFT MAINTENANCE HISTORY |
| ZRS384 | M3 KIT DETAIL REPORT |
| ZRT045 | PROJECTION OF INSPECTIONS/COMPONENTS |

INVENT, MAINT, CMPCTL,

INSPEC                                    MMM – MAIN MENU

Id..

L-3 employee Brett Pelham admitted at deposition that he used, copied and uploaded the

"ASI" reports in making M3:

> Q       What materials did you get from the users at any
> time that you used in connection with writing the source code?
> A       Printed reports from the ASI system.
> Q       How many of those did you receive?
> A       I don't recall an exact number.
> Q       Was it 10 or a hundred or a thousand, some
> magnitude, if you can?
>
>                  *    *    *
>
> A       My estimation would be that it would be between
> six and 18 reports that the users regularly used.
> Q       Would this be the screen presentations typically
> appearing on the ASI system?
> A       Typically it's printed reports with data and the
> column headings describing each column of data.
> Q       Would these have been the same images that would
> appear on the computer screen when a user accessed the ASI
> system or is this different?
> A       I didn't use the system on a daily basis so I couldn't
> say if they were the same or not.
> Q       Did you ever use the ASI system?
> A       For printing reports I worked with Sharen Poelman
> and Hector Arce to print reports.
> Q       Would you sit with them at a computer and tell
> them what kinds of stuff you needed and they would print it, is that
> how it worked?
> A       They would tell me these are the reports that we
> need to be able to maintain this data and would print out reports to
> show me what the data looked like and what the different fields
> were.
> Q       You had a computer?
>
>     MR. GELB:  Are you finished?  Please.
>
> A       At their, at their ASI computer.
> Q       Were you at the computer when they did this?
> A       With them, yes.

Q        And what would you then do with those reports?

A        We would take the written version and develop a draft screen as to what data they wanted to display based on the report and they would run the report electronically and we'd take the electronic version as input for loading the data.

Q        What was inputted from the electronic version?

A        The report.

Q        Where did you input it to, what files, what library place, what storage facility, where did you send this inputted material?

A        It went on a diskette from one -- from their ASI machine and moved to the PC I was working on imported into the database.

Q        What database was that?

A        It was MYSQL.

Q        I'm sorry?

A        MYSQL.

Q        What do you mean by your sequel?

A        That's the name of the database, it's M-Y-S-Q-L.

Q        What next happened with that material?

A        The user reviewed the data from the screen to see that the import was successful and they had all the fields that they were interested in, some of the fields they were not interested in, sometimes they had us add more fields.

Q        Did you ever delete any fields?

A        I don't recall deleting any fields that were imported but if there were fields that they didn't want, it didn't show them on the screen.

Q        And these fields and reports all came from the ASI system, is that correct?

A        It came from the reports, yeah.

Q        Which came from the ASI system?

A        Yes.


*     *     *


Q         Were these reports generated by the ASI system?

A        Yes.  Generated by the users on the ASI system.

Q        And ultimately these reports came from the ASI system?

A        Yes.

Rosen Aff., Exhibit 5 at 89-92.

By this testimony, L-3 thus admits the essential allegations of the complaint that the

defendant copied the ASI reports, report formats and screens and confirms the observations

described in the Declaration of Gordon Rosen filed herewith.  Because all of this material was a

part of the ARMS copyrighted material, it is clear that there is no issue of fact as to L-3's

liability for infringement of ARMS reports, report formats and screens and summary judgment

should be granted to Airframe as to liability for defendant's infringement of the ARMS (ASI)

reports and screens.

> B.  The Undisputed Facts Show That L-3 Invaded And Infringed The
>     ARMS (ASI) Source Code.

Mr. Rosen's declaration makes clear that L-3 invaded the ARMS source code.  At ¶¶ 24 and

25 he testifies that M3 contains create and modify dates prior to 2004 when Brett Pelham said he

began "developing" the M3:

> On my inspection of the M3 source code, I observed personally that
> the M3 code includes creation and last modification dates *prior* to
> 2004 the year L-3 employee Brett Pelham, the alleged designer of M3,
> testified he began developing the M3.
>
> Because the start and modification dates in M3 precede the date
> Pelham claims he began working on it, it is clear that M3 came from
> *other* sources, the only one known being the ARMS source code.

Rosen Aff. ¶¶ 24, 25.  Because the M3 code contains dates of creation prior to the date when L-3

says it began creating it, it is self-evident that other source code was imported to make M3.

Mr. Rosen testifies in detail that upon his personal inspection of the M3 source code in

discovery he observed extensive copying of data files and other coding information, noting that

"[t]his degree of identicality could arise only from L-3 having access to the ARMS source code

and using it to make the basis of its M3 code."  Rosen Aff. ¶ 30.  He states further:

> In M3 and the ARMS program, the names of the data elements
> were identical as were the functional flow of the programs we

examined.  We used a technique of copying and pasting the PHP text from M3, removing all but the HTML content, and using a standard web browser to display the page as the user would view it from M3 and then on my laptop displayed the corresponding ARMS screen and found an almost exact match in *every* case.

All of the creative content was copied as were the unconventional use of abbreviations and terms that were unique to the ARMS source code.

Id. ¶¶ 28, 29.

Examples of L-3 infringing the Airframe source code are legion in Mr. Rosen's certification:

Lines 1094-1284 of the M3 code is a copy of the ARMS program ZIS010.

M3 copies the ARMS hypenated "RE-SET" file.

M3 copies the ARMS "ONE-TIME" field name.

M3 copies the ARMS "INCLUDE ON TASK CARD TIE IN" function.

M3 copies the ARMS "PN (IF PN BASED)" function and the ARMS "Perform every", "early window", "late window", "Repeat every" sequence and followed by the ARMS three columns structure for "Hours   Cycles   Days".

M3 code lines 1163 to 1164 contain the statement "cannot determine use for capability in to not reset" indicating that the M3 designer used other source code that he did not understand.

At M3 code lines 1549-1613 appears the INSPECTION RE-SET function that is almost exact copy of ZIS080, the ARMS INSPECTION RE-SET function.

At M3 code lines 167-175 appears the "Kit_Browser.php" module containing the sequence "BASIC PART, ASSEMBLY, SUB-ASSSEMBLY, ENGINE, KIT PART" the exact duplicate of the same sequence in ARMS.

Lines 1549-1558 of the M3 code show chemas are lifted from the ARMS file: ZFLACTYI.RPG, ZFLINPC.RPG and ZFLACTYR.RPG.

M3 lines 584-826 are in the module inspection_forms.php that is an exact copy of the ARMS program ZIS090.

Lines 4161-4171 of M3 address the use of the table of Receipt Codes that is an exact copy of the ARMS list using the ARMS sequence in identical order with identical numbers attached.

Lines 4291-4358 of the M3 code referencing the INQUIRE TIME APPLIED TO AIRCRAFT function are an exact copy of the ARMS equivalent ZRT060 including the same code and sequence.

M3 code lines 3559-3632 and 3639-3668 that define the table schema for the serial and part masters are identical to the ARMS files of ZFLRSC1.RPG and ZFLRSC0.RPG.

M3 code lines 3798-3802 define the list of part status codes for "IN STOCK, ON AIRCRAFT, IN SUSPENSE, etc"; this was a list created for the ARMS program and the M3 version uses code letters as used by ARMS: I for IN STOCK, P for ON AIRCRAFT, S for IN SUSPENSE or QUARANTINE, etc.

Lines 1096-1314 of the M3 code define the ROTABLE PART MASTER screen which is the exact copy of the ARMS programs ZRT020.

M3 schema for the inspection data come from the ARMS file ZFLACTYI.RPG.

Menu entries such as "Batch, Keyword, Part # Search, and Rotable Chain List" are unique to ARMS and appear in the M3.

M3 uses the same six-character menu/file names as ARMS even though the PHP language in which M3 is written does not have a six-character limitation, as does the ARMS RPG-II language.

Menus CMPSUP was copied intact from ARMS to M3 but L-3 renumbered the menu item to conceal the copying.

M3 uses the ARMS menu "UPDATE KITS/ENGINES/ASSEMBLIES" even though this is usually referred in the industry as "Bill of Materials".  Industry uses function "K/E/A" but M3 copies the ARMS "KAE".

Id. ¶¶ 34-50.

Brett Peham also admitted at deposition that he used the ARMS (ASI) data files, column headings, and related material from the ASI program.   Id., Exhibit 5 at 105-106.

Because the undisputed facts show that M3 directly took code, data files and other material from the ARMS source code, summary judgment should be granted to plaintiff on the issue of defendant's liability for infringement of the source code.

C.  No Defense Exists That The Copied Materials Are In The Public Domain Or
Are Otherwise Non-Protectible; The 6th And 17th Affirmative Defenses
Should Be Dismissed.

L-3's 6th and 17th affirmative defenses sound in fair use (6th affirmative defense) and public

domain (17th affirmative defense).

L-3 has failed to marshal or document any evidence to substantiate these claims. Although

Airframe expressly asked L-3 to identify the factual basis of its defenses that this material is non-

protectible or is in the public domain, L-3 never provided any response setting forth any factual

basis to such defenses.

Airframe's Interrogatory No. 4 expressly sought the factual basis of L-3's affirmative

defense of "fair use":  "Set forth fully and describe and substantiate the factual basis for L-3's

defense of fair use set forth in L-3's 6th Affirmative Defense."  In response, L-3 failed to provide

any factual information to substantiate this defense.

Airframe's Interrogatory No. 6 sought the factual basis of L-3's affirmative defense that the

copyrighted material is in the public domain by virtue of provisions of the FAA regulations:

> Set forth fully and describe and substantiate L-3's 17th Affirmative
> Defense, including but limited to the assertion that "maintenance
> report headings and coverages" are not proprietary to plaintiff or
> within its Copyright Act protections, as asserted in the 17th
> Affirmative Defense; identify fully all such "report headings and
> coverages".

L-3 also failed to provide any factual information as to this defense.  See L-3 Responses to

Plaintiff's Interrogatories, attached hereto as Exhibit 2.

Because L-3 has failed to substantiate in any manner its 6th and 17th affirmative defenses

based on fair use and public domain, summary judgment should be granted to plaintiff

dismissing these defenses.

In addition, Mr. Rosen testifies that *other* vendors use *other* organizing systems different from the ASI system and he attaches examples of other vendor formats that differ materially from the ASI reports and formats, see, e.g., Rosen Aff. ¶ 33 and Exhibits 1 and 2 thereto, a further bar to any fair use or public domain defense.

    D.  Because L-3 Admits Using The Source Code, Reports And Screens In Making M3, The Fourth Affirmative Defense Must Be Dismissed.

Brett Pelham, L-3's alleged designer of M3, has admitted using the ASI reports and screens and the ASI data files in creating M3.  See, supra, at 12-14; Rosen Aff., Exhibit 5 at 105-06. Accordingly, there is no triable issue of material fact as to L-3's Fourth Affirmative Defense that "L-3 . . . made no use of Airframe's source code at any point during the development of the accused M3 product."  See L-3's Answer, Fourth Affirmative Defense.  L-3's Fourth Affirmative Defense must be dismissed.

    E.  Factual Issues Exist As To Damages That Preclude Any Determination Of This Issue At the Motion Stage.

L-3's motion as to damages seeks to limit damages solely to its profits from its MID division that it claims is the exclusive user of M3.  This argument is beside the point, as the Complaint is not limited to damages from use of M3 only, but for *any* use of infringing software.

L-3 produced only the M3 program but admitted in deposition **on the last day of discovery -- April 23, 2010 --** that it uses *other* in-house, home-made aviation maintenance programs throughout the AM&M division.  At page 93 of the Arce transcript, he specifically acknowledges that L-3 uses in-house, "proprietary" programs named "WECMS" and "BED", that have been used by L-3 since at least 2000, both of which Arce said were "in-house" programs.  Arce Transcript at 93-95.

Thus, the factual record shows that the in-house aviation software in use at L-3 is not limited

to M3, but includes the more widely used WECMS and BED programs in the broader AM&M

division, thereby substantiating Mr. Chodor's report that bases damages on the broader revenues

of the full AM&M division.   See Chodor Report at 19-23.

Moreover, Arce testified that he intentionally limited his inquiries to this limited use and did

*not* make broader inquiries as to potential use of the infringing software:

> Q.      Sir, do you have that Deposition Notice in front of you?
> A.      Yes.
> Q.      All right.  And at the bottom of the first page and carrying over to the second page, you were asked to testify about a number of things as the Designated Representative of L-3, correct?
> A.      Yes.
> Q.      And one of those was "the use of aircraft maintenance, modification, and/or tracking software or computer programs in the AM&M division of L-3 Communications Corporation," correct?
> A.      Yes.
> Q.      The same topic with respect to the L-3 Mission Integration Division, correct?
> A.      Yes.
> Q.      And following that, you were also asked to come here today and testify about the **use of aircraft maintenance, modification, and/or tracking software or computer programs** in **any** other L-3 division or business or reporting unit, isn't that correct?
> A.      Yes.
> Q.      Okay.  Now you did not make an inquiry of all other L-3 division or business or reporting units in preparation for your testimony today, isn't that correct?
> A.      "All," that is correct.
>
> * * *
>
> Q.      You have not come here today to talk about the use of aircraft maintenance, modification, and/or tracking software or computer programs in any L-3 division or business or reporting unit, other than the AM&M division; is that correct?
> A.      No.
> Q.      Well, what -- I think you just told me that you did not make an inquiry as to the use of aircraft maintenance, modification, and/or tracking software or computer programs in all divisions or business or reporting units of L-3?

> A.      You said "all."  We did in C3ISR, which is part of the MID organization.
>
> Q.      But that doesn't comprise "all division or business or reporting units of L-3," isn't that correct?
>
> A.      But you had asked me all, so I did some, but not all.
>
> Q.      Some, but not all, correct?
>
> A.      Correct.
>
> Q.      So your inquiries today were restricted to solely the use of aircraft maintenance, modification, and/or tracking software or computer programs in the company's divisions and business groups that fall under the umbrella of the Mission Integration Division; is that correct?
>
> A.      No.  You've said two different things.  "Business segments" and "divisions" are not the same --
>
> Q.      kay.
>
> A.      -- in your context there.
>
> Q.      Okay.  *Well, you said that you limited your inquiry for today's deposition to which group?*
>
> A.      Which group?
>
> Q.      Yes, sir.
>
> A.      *The Integrated Systems Group.*
>
> Q.      All right.  *And you made no inquiry as to any other group of L-3 outside the Integrated Systems Group to determine their use of aircraft maintenance, modification, and/or tracking software or computer programs; is that correct?*
>
> A.      *Correct.*

Arce Transcript at 56-60 (emphasis added).

Arce elaborated on this testimony making it clear that he made only the most narrow inquiry of two small units, not the broader AM&M division:

> Q.      Now what divisions or business segments or groups within the Integrated Systems Group were involved in your inquiries in response to today's deposition as a Designated Representative of L-3?
>
> A.      Vertex, JOG, which is our Joint Operations Group in Kentucky, Crestview, Waco, which are all part of the AM&M Business Segment.
>
> * * *
>
> Q.      Now did you speak to any other business segment other than the Vertex, JOG, Crestview, or Waco Business Segment in responding to the Deposition Subpoenas and Notices for today?

A.      None other than what's in my affidavit.

Q.      Okay.  Well, is there any other business segment that's described in your affidavit, other than JOG, Vertex, Crestview, and Waco, sir?

A.      No.

Arce Transcript at 60-61, 66.

Arce's complete testimony makes it clear how limited his scope of knowledge and factual inquiry were:

Q.      To your knowledge, has any other business segment or division of L-3 other than Vertex, JOG, Crestview, and Waco ever utilized aircraft maintenance, modification, and/or tracking software or computer programs?

A.      I don't know.

* * *

Q.      Were there any other locations other than the Greenville location, Vertex, JOG, Waco, and Crestview that utilized maintenance tracking software in the years that you've been with L-3?

A.      Have they utilized software?

Q.      Aircraft maintenance tracking software.

A.      Which I said in here, (indicating), some of these for ten years at Vertex.

Q.      Any other locations, sir?  I'm not talking about Vertex.

A.      I don't know.

Q.      You don't know.  And you've never made an effort to figure out if that was the case; is that correct?

A.      I made an effort to determine what AM&M companies used.

Q.      All right.  Are the AM&M companies -- **are there other companies within L-3 that do or have done aircraft maintenance, modification, and tracking?**

**A.      Yes.**

* * *

Q.      And outside of Greenville, Vertex, JOG, Waco, and Crestview, you did not make any inquiry as to use of the aircraft maintenance tracking software within any other group, **division, or segment of L-3; is that correct?**

**A.      <u>Correct.</u>**

Id. at 66-67, 144-146 (emphasis added).

Thus, L-3's designated Rule 30(b)(6) witness as to damages, testified that his examination and inquiry of this matter were limited.  But even in such case, Arce still testified as to use of the L-3's in-house aviation software by the full AM&M division with its nearly $3 billion in annual revenues, as Mr. Chodor testified and as he states in his report.

Moreover, L-3 never provided the noticed documents as to its claim that damages are limited. Airframe expressly asked for all documents relating to use of aviation software outside of the MID, but Arce stated that he did not have such documents and made no search for them.  Arce Transcript at 106-08.  Arce even testified that L-3's counsel instructed him NOT to produce such documents.  Id. at 131-32.[1]  Finally, although Arce disclosed that other in-house aviation maintenance software is in use at L-3, as the complaint alleges, he testified that he did not bring such documentation and did not know why he failed to do so.  Id. at 107-08.

L-3 also failed to produce Kenneth Spivey as a witness, although he was the primary source of the claim that M3 use was limited to the MID.  Spivey was a court-ordered witness, but L-3 has not produced him to testify as to these claims of limited damages.  Consequently, because L-3 itself has not made available documentation about the wider use of aviation software at L-3 and has not made a critical witness, Spivey, available, it would be inappropriate to grant any limiting order as to damages at this stage.

Moreover, Airframe has pending a motion to either compel such evidence and it would be inappropriate for the Court to make any ruling on damage while these issues are still outstanding, particularly since the relevant information is still in the undisclosed possession of L-3's

---

[1]       Airframe currently has a motion pending to sanction L-3 for failure to produce the required documents as to the damages issues.  As that discovery issue is outstanding it is inappropriate for the Court to decide any motion from L-3 that purports to limit damages.

witnesses who, as in the case of Mr. Arce, failed to bring documents responsive to the issue, or, in the case of Spivey, were not produced to testify despite the Court's order of April 10, 2010.

<u>Conclusion</u>

For these reasons, the cross motion for summary judgment should be granted in favor of Airframe establishing L-3's liability for infringement of the ARMS source code and the reports and screen interfaces and dismissing the 4th, 6th and 17th affirmative defenses.

Assuming, *arguendo*, that the Court finds it cannot grant the cross motion, the testimony of Mr. Rosen establishes that there is an issue of fact as to L-3's infringement and its affirmative defenses and the defendant's motion should be denied.

AIRFRAME SYSTEMS, INC. f/k/a/
Airline Software, Inc.
By its attorneys,

/ S / Peter B, Krupp

Dated:  June 7, 2010                                Peter B. Krupp
                                                      B.B.O. No. 548112
                                                    Lurie & Krupp, LLP
                                                    One McKinley Square
                                                    Boston, MA 02109
                                                    Tel:  617-367-1970


/ S /  Bruce I. Afran

Bruce I. Afran
  NJ BA 8583
10 Braeburn Drive
Princeton, NJ 08540
Tel:  609-924-2075

CERTIFICATE OF SERVICE

I, Peter B. Krupp, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non registered participants on June 7, 2010.

/ S /  Peter B. Krupp

Peter B. Krupp