UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AIRFRAME SYSTEMS, INC. f/k/a<br>AIRLINE SOFTWARE, INC.,<br><br>      Plaintiff,<br><br>v.<br><br>RAYTHEON COMPANY,<br>and<br>L-3 COMMUNICATIONS CORPORATION,<br><br>      Defendants. | Case No. 1:08-cv-11940-WGY |

**DEFENDANT L-3 COMMUNICATION CORPORATION'S RESPONSES AND OBJECTIONS TO PLAINTIFF AIRFRAME SYSTEMS, INC.'S FIRST SET OF INTERROGATORIES (NOS. 1-20)**

For its responses and objections to Plaintiff Airframe Systems Inc.'s ("Airframe") First Set of Interrogatories (Nos. 1-20), Defendant L-3 Communications Corporation. ("L-3") states as follows:

**GENERAL OBJECTIONS**

The following objections shall be deemed to be incorporated in and to apply to L-3's response to each and every Interrogatory propounded by Airframe. L-3's responses are made without prejudice to any position as to admissibility at trial.

1. L-3 objects to these discovery requests to the extent that they are vague, undefined, ambiguous, duplicative, cumulative, unduly burdensome, overly broad, oppressive, and/or call for information not relevant to a claim or defense of any party to this action.

2. These responses and objections by L-3 to Airframe's First Set of Interrogatories are provided pursuant and subject to the terms of the Stipulated Protective Order dated November 23, 2009.

3. L-3 objects to providing any information that is subject to the attorney-client privilege, the work product immunity, the common interest doctrine, or any other applicable privilege, immunity, or doctrine. Any specific objection made on the basis of privilege shall be deemed to include an objection on the basis of the attorney-client privilege, the work product immunity, and the common interest doctrine, where applicable. Moreover, L-3 will interpret each request to exclude from its scope information that is subject to the attorney-client privilege, the work-product immunity, and the common interest doctrine.

4. L-3 objects to providing any trade secret or other confidential research, development, or commercial information of any third party, which is in L-3's possession pursuant to confidentiality and non-disclosure restrictions imposed by contract or law.

5. L-3 objects to these discovery requests as premature to the extent that they seek L-3's contentions regarding its ultimate positions in this action because discovery is in the early stages.

6. L-3 objects to these discovery requests to the extent that they seek to impose any discovery obligation on L-3 that exceeds or is inconsistent with the requirements of the Federal Rules of Civil Procedure and the Local Rules.

7. L-3 objects to these discovery requests to the extent that they seek information or the identification or production of documents relating to aspects of L-3's business that are not relevant to a claim or defense of any party to this action on the grounds that such information and

documents include highly confidential material and/or would be unduly burdensome and oppressive to collect and produce.

8. L-3 objects to these discovery requests to the extent that they seek information or documents that are in the public domain because it is equally convenient for Airframe to obtain such information.

9. L-3's agreement to produce information relevant to a particular request should not be construed to mean that L-3 has any such requested relevant information in its possession, custody, or control. Moreover, L-3's agreement to produce information shall not be construed as any admission that such information is relevant or otherwise admissible.

10. L-3 objects to the production of any documents constituting, reflecting, representing, or concerning confidential settlement discussions.

11. L-3 objects to the production of documents whose confidentiality is guaranteed by statute.

12. L-3 objects to the production of documents whose confidentiality is guaranteed by L-3's contractual obligations.

13. L-3 objects to Airframe's definition of "L-3" to the extent that this definition includes legal entities separate and distinct from L-3 Communications Corporation and/or are not parties to this litigation, and seeks to request documents and/or information under the control of those entities.

14. L-3 objects to Airframe's definition of "Airframe," "Plaintiff," and "ASI" as vague and ambiguous to the extent that this definition includes entities undefined and unknown to L-3, and/or are not parties to this litigation.

15. L-3 objects to any request for "all" documents or information relating to any subject matter as unduly burdensome and oppressive. L-3 will produce relevant responsive documents not subject to any privileges discovered after a diligent and reasonable search, pursuant to the terms of the Stipulated Protective Order dated November 23, 2009.

16. L-3 will deliver documents to the offices of Bruce I. Afran, 10 Braeburn Drive, Princeton, NJ 08540 or Lurie & Krupp, LLP, One McKinley Square, Boston, MA 02109 and Airframe will deliver documents to Jones Hirsch Connors and Bull P.C., One Battery Park Plaza, New York, NY 10004.

17. L-3 objects to providing any information about the disposition of a document no longer in its possession as excessive in scope and unduly burdensome.

18. L-3's investigation of facts is continuing. The responses made at this time are without prejudice to L-3's right to amend or supplement as appropriate.

19. Except as specifically indicated to the contrary, responses are made by and involve activities and documents of the L-3 Communications Corporation Integrated Services Division ("L-3IS").

## RESPONSES TO INTERROGATORIES

**1. Set forth and describe fully all training, training techniques, programs, methods, and the like used by L-3 and/or the United States in connection with the M-3 program or users thereof including a description of all manuals used, all written or computerized materials used, all computer files used, all reference works used and identify any other memoranda or documents in connection with such training.**

**RESPONSE**: By Spring 2005, M3 was deployed in field sites and Customer aircraft maintenance data had been entered into the system. User training began at or about this time and

was performed by Brett Pelham and Sharen Poelman of L-3IS, (with the assistance of Ray Watson from time to time on parts-related issues) whose joint effort had been principally responsible for creating the maintenance tracking elements of the M3 system. Actual operation of M3 by the trainees was the principal means of instructing each in its use and operation. At some sites, training was performed by individuals, who had themselves been trained in the use and operation of M3 and became trainers of others by the same method of actual use and operation of M3.

Those users trained on M3 were selected for qualities such as substantial experience in the performance of aircraft maintenance, familiarity with its terminology and equipment involved. Many were familiar with computer utilization and capacities such as use of windows-based software including a mouse which was a feature of M3 operation.

The training program included parallel operation of both M3 and the existing maintenance program, with user/trainees inputting actual maintenance data into both systems utilizing such sources as Pilot's Log Books, Discrepancy Records and Maintenance Discrepancy Reports.

A meaningful element of training involved familiarization of the user/trainee with a windows – based software which had been in common use for a number of years but was applied by M3 to aircraft maintenance at L-3IS for the first time.

Given the substantial experience levels of user/trainees, there was no need to create user manuals, with actual, on the job use of M3 as the focus of the training regimen.

Training sessions for individual users or groups of users generally involved between 1 and 2 1/2 hours, depending upon the user's familiarity with windows-based systems, and FAA aircraft maintenance terms and procedures. Once training was conducted the practice followed

was to have users send e-mails to Sharen Poelman setting forth questions to deal with individual issues. Those communications and responses continued the training process.

As improvements or modifications of M3 became available, users were trained in their application, a process which continues today.

L-3 is unable to respond as to all training techniques, programs methods and the like used by the United States in connection with the M3 program or users thereof except insofar as the procedures were performed by or involved L-3IS personnel.

**2.   Set forth and describe fully the "government customer" referred to in paragraph 98 of the Answer including the agency or department, the nature of services performed by L-3 for the customer, all contractual documents in connection with said services, the L-3 personnel who work with the government customer and the manner in which the government customer obtains services in connection with the M3 program.**

<u>RESPONSE</u>: The "government customer" identified in Answer ¶98 is the 645th Aeronautical Systems Squadron (AFMC), PO Box 6056, CBN029 Greenville, Texas 75403-6056 (the "government customer"), which is a subset of the 645th Aeronautical Systems Group, which is a program office in the 303rd Aeronautical Systems Wing, which is an element of the Aeronautical Systems Center, which is a unit of the Air Force Material Command, which is one of several major commands within the United States Air Force. The nature of the services performed by L-3IS for the government customer includes (i) aircraft maintenance tracking through the M3 system, (ii) maintenance and development of the M3 system, and (iii) aircraft maintenance and modification.

L-3IS personnel trained in the use of M3 perform maintenance tracking services with the objective of scheduling maintenance to meet OEM & FAA service and maintenance

requirements. A Basic Ordering Agreement ("BOA") between L-3IS and the government customer governs purchase orders issued for the performance of particular maintenance procedures. Each such purchase order is classified and protected from disclosure as referred to under NISPOM.

A separate agreement between L-3IS and the government customer governs maintenance and upgrade of M3. This agreement is likewise classified and protected from disclosure as referred to under NISPOM.

3.   **Set forth and describe specifically and fully the manner in which L-3's "government customer" is enabled to "conduct aircraft maintenance through use of L-3's M3 program" as asserted in paragraph 101 of the Answer and describe fully any and all contact between the government customer and the M3 program, including any interface or communication between the government and the M3, any usage of the M3 by the government or its personnel and/or any access in any manner to the M3 by the government customer.**

**RESPONSE:** M3 performs the function of tracking maintenance and maintenance-related functions. By analysis of data, OEM and FAA requirements, M3 may assist to predict future maintenance scheduling requirements. By use of M3's maintenance tracking capacity, the government customer may be enabled to enter into purchase orders or individual purchase order contracts with L-3IS for the performance of maintenance under BOA terms. In this manner maintenance may be performed. These purchase orders or purchase order contracts are classified as referred to under NISPOM and protected from disclosure thereunder. M3 does not operate to perform the maintenance function itself, and merely tracks the same.

The government user may access M3 to predict or forecast maintenance requirements under FAA directives and to use the predictive capacity of the system to achieve efficient maintenance for its air fleet. The system also operates to assist in planning and programming associated budgetary needs. The government user, having requested development of M3 and paid the cost of its creation, modification and continued development, has a royalty free, world-wide, non-exclusive, irrevocable, unlimited rights license to use of M3 and may direct and exercise its use without limitation.

4. **Set forth fully and describe and substantiate the factual basis for L-3's defense of fair use set forth in L-3's 6th Affirmative Defense.**

RESPONSE: L-3 objects to this request as premature in that plaintiff has yet to disclose or identify the elements of its source code or software protected by its copyright registrations or which are alleged to form a basis for its claims.

5. **Set forth fully and describe and substantiate the factual basis for L-3's defense of unclean hands set forth in L-3's 12th Affirmative Defense.**

RESPONSE: L-3 objects to this request as premature in that plaintiff has yet to disclose or identify the elements of its source code or software protected by its copyright registrations or which are alleged to form a basis for its claims.

6. **Set forth fully and describe and substantiate L-3's 17th Affirmative Defense, including but limited to the assertion that "maintenance report headings and coverages" are not proprietary to plaintiff or within its Copyright Act protections, as asserted in the 17th Affirmative Defense; identify fully all such "report headings and coverages".**

RESPONSE: L-3 objects to this Interrogatory as premature in that plaintiff has yet to disclose or identify those maintenance report headings and coverages which it claims to be

included in its source code or software, protected by its copyright registrations or which are alleged to form a basis for its claims.

7. Identify fully and describe any and all aspects of Airframe's source code or parts thereof that L-3 contends: a) are in the public domain; b) are not proprietary to plaintiff; 3) are not within plaintiff's Copyright Act protections or 4) are subject to "fair use" by L-3.

RESPONSE: L-3 objects to this Interrogatory as premature in that plaintiff has yet to disclose or identify those maintenance report headings and coverages which it claims to be included in its source code or software, protected by its copyright registrations or which are alleged to form a basis for its claims.

8. Set forth and identify fully all parts of the M3 program including any text, words, code, sentence, notes, comments, headings, columns, design elements or components, organizational elements, screen interfaces, screen layouts, lists or other organizational devices, and the like, that: a) are in or can be found in Airframe's computer programs; b) were borrowed, taken, copied or otherwise identified from Airframe's computer programs and/or c) were known to L-3 or its personnel as a result of their use and exposure to Airframe's computer programs.

RESPONSE: L-3 objects to this Interrogatory as premature in that plaintiff has not yet disclosed or identified the text, words, code, sentence, notes, comments, headings, columns, design elements or components, organizational elements, screen interfaces, screen layouts, lists or other organizational devices and the like which are the subject of this request.

9. Do you contend that Brett Pelham wrote the entire M3 program including all words, text, code, sentences, notes, comments, and the like in the program and, if not,

**identify what specific parts of the M3 program he did not write including the sources for all such material?**

<u>RESPONSE</u>: The M3 program was created by an iterative process between Brett Pelham and Sharen Poelman of L-3IS, the proposed supervising user of the program, on a trial and error basis. From time to time Mr. Pelham consulted Ray Watson on parts-related issues. The user would identify a function to be performed, Mr. Pelham would create code instructions by which such function might be implemented. The resultant code would be tested in order to determine its efficacy. Revisions would be created as needed until the proposed user confirmed that this functional aspect was satisfactory. In this manner, the aircraft maintenance related sections of the M3 code were created. L-3 further refers plaintiff to the prior deposition testimony of Mr. Pelham in this connection.

Those sections of M3 code which created and applied internal security functions for the system were not written by Mr. Pelham. The initial web portal architecture, the framework in which the application runs, was not written by Mr. Pelham. Both were created by Paul Stewart.

**10.    Set forth and describe the reasons Bret Pelham was chosen to create the M3 program including the persons who chose him, the substance of any discussions at L-3 concerning such decision and the reasons why he was chosen.**

<u>RESPONSE</u>: Mr. Pelham was chosen to create a new proprietary aircraft maintenance tracking system. He was assigned to this task based upon his background and experience in creating programs and in analysis, and his availability to perform this service according to his then scheduled commitments. He was chosen by his superiors in the IT section of Integrated Resources Division with the approval of the government customer.

11. Do you contend that no part of the M3 program came from, was derived from, originated from or otherwise appeared in any form or format in Airframe's computer programs; if your answer to this interrogatory is "No", then identify fully all parts of the M3 program that came from, were derived from, originated from or otherwise appeared in Airframe's computer programs.

**RESPONSE**: L-3 contends that M3 was not copied, originated or derived in whole or in part from the ASI source code as alleged in the complaint. L-3 further notes ASI's statement in that a portion of ASI source code was identified by its President Gordon Rosen during a remote inspection of the library of the computer operating its aircraft maintenance software, as stated in the Rosen Certification submitted in the New York Action. The source code library files were identified in a screen shot created by Hector Arce of L-3IS who was simultaneously on line and able to observe the library file entries identified by Mr. Rosen. At that time, upon demand of Mr. Rosen, Mr. Arce deleted all such files, thereby destroying them.

In creating M3, and transferring to it data belonging to L-3IS' government customer, the headings under which the data had been stored were deleted and not incorporated into the M3 system.

This request is otherwise premature in that ASI has not yet identified any portions of the M3 program claimed to have been derived, originated from or otherwise appearing in ASI's program.

12. Describe fully the reasons why L-3 chose to or made the decision to create, develop, write or otherwise obtain its own aircraft maintenance and/or engineering software, including but not limited to all communications with the United States that led to or influenced such decision or related to such matter.

**RESPONSE:** The decision to create, develop, write and thereby to obtain a new, proprietary aircraft maintenance tracking system, was the result of a series of considerations for both L-3IS and its government customer. Both wished to be afforded control and use of a user-friendly, technologically advanced program, performing reliably, flexibly and efficiently, capable of upgrades and improved capacities whose use and operation were consistent with security concerns. The ASI software failed to satisfy those requirements.

L-3 had conducted a Maintenance Reporting System survey of evaluations of its existing licensed maintenance software by e-mail dated October 15, 2003 sent by George L. Bach, Senior Manager of L-3IS, with responses to be reported to the government customer. Documents reflecting the survey and responses, along with other documents discussing dissatisfaction with the ASI software, are produced bearing Bates Stamp Nos. L-3IS-MA2-02231 - L-3IS-MA2-02318.

Prior to the conduct of the survey ASI had recognized varied elements of dissatisfaction with ASI and its aircraft maintenance program by offering a newer and updated system known as SPECTRUM free of installation charge. (See L-3IS-MA2-02319 - L-3IS-MA2-02330). That proposal was rejected out of hand once L-3IS was advised that classified customer data was required to be maintained on a server in the possession to control of ASI.

Survey comments included those showing that satisfactory performance by the ASI software was "few and far between"; the system was not reliable because it was "down quite frequently" – see, e.g. reference to "occasions when records are impounded, the entire system has to be shut down" – "other than that I hate it!!!!" "ASI is slow to open and slow to close. Estimate at times 2-4 minutes" system is not reliable.

Needs a windows based program and a mouse compatibility. (Id.)

Additional dissatisfaction with reliance on ASI and its program was caused by the absence of service capacity from ASI, placing L-3IS service at risk of inadequate support.

L-3IS was engaged to create the program which came to be known as M3, by the government customer which provided funding for the labor and materials to create the program. No fee or profit was paid to L-3IS in excess of the cost of labor and materials to create the program and no license or other user fee was paid by the government customer.

Certain documents reflecting communications with the government customer are classified and may not therefore be produced.

13.  **Has the M3 program been modified, upgraded or changed in any manner and in any degree since November 1, 2008 and, if so, identify fully all such changes, upgrades or modifications and the dates when they were made, and identify the persons who played any role in such changes, upgrades or modifications.**

RESPONSE: L-3 objects to this interrogatory insofar as it is barred by the Court's April 7, 2009 order of dismissal. Without waiver of this objection, L-3IS will produce M3 for inspection from which response to this request may be derived.

14.  **Identify fully any L-3 software or part thereof created, developed, derived or resulting from, in whole or in part, any material, text, code, writing or words from Airframe's source code or computer programs or that appeared in Airframe's source code or computer programs.**

RESPONSE: L-3 had no access to ASI source code and did not create, develop, deliver or produce M3 from any such source code or computer program or its content or from ASI computer programs. Before transferring stored government customer data to M3, headings of existing data were deleted.

15. Set forth and describe fully any and all dissatisfaction, complaints, difficulties, and the like with Airframe software experienced by L-3 or its personnel or its government customer or any customer.

**RESPONSE:** L-3 responds to this request by reference to documents identified above and by its responses to Interrogatory No. 12.

16. Identify fully, including all identifying information known to you, all L-3 customers who obtain any services through use of the M3 program in any manner and in any degree.

**RESPONSE:** The only customer which obtains M3 services from L-3 is the government customer.

17. Describe fully any and all requests, inquiries, orders, directives, demands and communications of any nature by the United States relating to L-3's developing, creating, implementing or otherwise obtaining software to replace, substitute for or replicate in any manner or degree the Airframe aircraft maintenance and/or engineering software.

**RESPONSE:** Documents and information responsive to this request are designated as classified as referred to under NISPOM and disclosure is accordingly barred. There was no request to replace, substitute for or replicate in any manner or degree the ASI maintenance and/or engineering software. See Response to Interrogatory No. 12.

18. Set forth and describe fully all communications between the United States and L-3 concerning the acquisition, development or creation by L-3 of aircraft maintenance software generally or specifically to replace, substitute for or replicate in any manner or degree Airframe software.

<u>RESPONSE</u>: Documents and information responsive to this request are classified as referred to under NISPOM and may accordingly not be disclosed. The Basic Ordering Agreement between L-3IS and the government customer is not classified (and is produced bearing Bates Stamp Nos. L-3IS-MA2-03133 - L-3IS-MA2-03217), but specific ordering documents are designated as classified as referred to under NISPOM. The objective of the engagement is set forth in response to Interrogatory 12.

**19. Identify fully all persons who played any role in any manner in connection with the development of the M3 program, including their employer, residence and a statement of their specific role in such matters.**

<u>RESPONSE</u>: The initial program was written entirely by Brett Pelham in an iterative process with Sharen Poelman as described in response to Interrogatory No. 9, except that Paul Stewart created the initial web portal architecture (the framework in which the application runs) and the user security portion of the program. Hector Arce assisted in the initial transfer of customer data to the M3 system.

Since the program was initially created, various analysts have worked on modifying M3 by writing specifications and various developers have worked on modifying M3 by writing code for the program. Brett Pelham has been the primary person assigned to this project to the present. Rosemary Alderman has been primarily assigned to development and support of M3 since August, 2007; Kian Ellis and Patrick McDougle have been primarily assigned to development of M3 since mid 2008. Jason Beck has been primarily assigned to development of M3 since January 2009. Robert Greiner assisted with development of M3 between May 30, 2007 and September of 2008. Cameron Carter has been occasionally called upon to lend development support. Robert Evans was called upon to lend development support on a single

occasion. Jana Weber was called upon to lend support in testing on one or two occasions in 2008 or 2009.

The project managers for the M3 project were, in chronological order, John Barnett, George Bach, Matt Halman, Hector Arce and Amy Ling.

All persons identified here were L-3 employees with the exception of Paul Stewart, who was an employee of the government customer.

**20.    Identify fully all text, words, sentences, comments, notes, code or combinations of same in the M3 program that are identical to any part of the Airframe software and state where L-3 obtained such material.**

<u>RESPONSE</u>: None of the text, words, sentences, comments, notes, code or combinations of same in the M3 program was taken from ASI source code as alleged in the complaint. L-3 objects to this Interrogatory as premature in that plaintiff has yet to identify or disclose the text, words, sentences, comments, notes, code or combinations of same claimed to be included in its source code or software, protected by its copyright registrations or which are alleged to form a basis of its claims.


Dated:    December 14, 2009             Attorneys for Defendant
                                        L-3 Communications Corporation


                                        /s/ Alan M. Gelb
                                        Alan M. Gelb (AMG 4254)
                                        Randi Lane Maidman (RLM 6892)
                                        JONES HIRSCH CONNORS & BULL P.C.
                                        One Battery Park Plaza
                                        New York, New York 10004
                                        (212) 527-1000 Telephone
                                        (212) 527-1680 Facsimile

Local Counsel for Defendant
L-3 Communications Corporation


 /s/ Maria Raia Hamilton
Kurt L. Glitzenstein (BBO#565312)
Maria Hamilton (BBO# 554798)
Adam J. Kessel (BBO#661211)
FISH & RICHARDSON P.C.
225 Franklin Street
Boston, MA 02110-2804
(617) 542-507- Telephone
(617) 542-8906 Facsimile

## VERIFICATION

I have read the foregoing L-3'S OBJECTIONS AND ANSWERS TO PLAINTIFF'S FIRST INTERROGATORIES, I am authorized to make this verification for and on behalf of L-3, and I make this verification for that reason. Upon information and belief, I believe the matters stated in the foregoing document are true. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: December 14, 2009
      Greenville, TX

_____
Sharen Poelman