UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

AIRFRAME SYSTEMS, INC. f/k/a
AIRLINE SOFTWARE, INC.,

        Plaintiff,

    v.

RAYTHEON COMPANY
and
L-3 COMMUNICATIONS CORPORATION,

        Defendants.

Case No. 1:08-cv-11940-WGY

## L-3'S REPLY MEMORANDUM IN SUPPORT OF ITS
## MOTION FOR SUMMARY JUDGMENT

Kurt Glitzenstein (BBO # 565312)
Adam Kessel (BBO # 661211)
Danni Tang (BBO # 669563)
FISH & RICHARDSON P.C.
Attorneys for Defendant
L-3 Communications Corporation
225 Franklin Street
Boston, MA   02110-2804
Phone: (617) 542-5070
FAX: (617) 542-8906

<u>Of Counsel</u>

Alan M. Gelb (AG 4254) admitted *pro hac vice*
Kirstin Peterson (KP 6850)
JONES HIRSCH CONNORS & BULL P.C.
Attorneys for Defendant
L-3 Communications Corporation
One Battery Park Plaza
New York, New York 10004
Phone: (212) 527-1000
FAX: (212) 527-1680

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 1

A.    AIRFRAME FAILED TO DISPUTE L-3'S STATEMENT OF UNDISPUTED FACTS, WHICH ARE THUS DEEMED ADMITTED. ................................................. 1

B.    AIRFRAME FAILED TO DISPUTE THE CRITICAL AND DISPOSITIVE LIABILITY ARGUMENTS RAISED IN L-3'S MOTION FOR SUMMARY JUDGMENT. ............................................................................................................... 3

C.    THE COURT SHOULD STRIKE MR. ROSEN'S AFFIDAVIT AND ACCORDINGLY GRANT SUMMARY JUDGMENT BASED ON AIRFRAME'S LACK OF EVIDENCE. ............................................................................ 4

D.    AIRFRAME'S NEW THEORY OF INFRINGEMENT IS PRECLUDED BY THE MAY 13 ORDER. ....................................................................................... 8

E.    AIRFRAME HAS FAILED TO SHOW ANY MISAPPROPRIATION OF PROTECTABLE EXPRESSION. ......................................................................... 9

    1.    Airframe Failed to Show Any Misappropriation of Source Code. ............................... 9

    2.    Airframe Failed to Show Misappropriation of Protectable Expression in Reports, Screens, Menus, or Maintenance Data. ........................................................ 10

        (a) Airframe Has Shown No Misappropriation of Output Reports. ................................. 11
        (b) Airframe Has Shown No Misappropriation of Menus. ............................................. 11
        (c) Airframe Has Shown No Misappropriation of Column Headings. .............................. 12
        (d) Airframe Has Shown No Misappropriation of Maintenance Data. ............................. 12

F.    AIRFRAME HAS FAILED TO SHOW ANY TRIABLE ISSUE EXISTS ON DAMAGES. ........................................................................................................ 13

    1.    Airframe Has Conceded Its Failure to Meet Its Burden on Damages on Both the Law and the Facts. ............................................................................................. 13

    2.    Airframe Fails to Distinguish Actual Loss from Infringer's Profits or Base Any Calculation on Actual Use of the Accused Software. ......................................... 15

    3.    Airframe Fails to Show Any Causal Relationship for Actual Damages. .................... 16

        (a) Airframe Does Not Dispute that No Evidence Shows M3 Was Used in AM&M, the Only Business Unit on Which Airframe Bases Its Damages Theory. ...................................................................................... 16
        (b) Airframe Does Not Dispute that Its Damages Calculation Is Not Based on a Hypothetical Negotiation. ................................................................... 17

(c) Airframe Does Not Dispute that Its Damages Calculation Has No Basis in Its Own Historical Licensing Practices. ................................................................. 17

(d) Airframe Does Not Dispute that Its Damages Calculation Has No Basis in Industry Practice. ................................................................................................. 17

4.    Summary Judgment Should Be Granted Denying Airframe Any Profits. .................. 18

(a) Airframe Does Not Dispute that It Has Not Shown Any Revenue Attributable to the Alleged Infringement. .................................................................. 18

5.    Airframe Misrepresents Hector Arce's Testimony. ..................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Abeshouse v. Ultragraphics, Inc.*,
   754 F.2d 467 (2d Cir. 1985) ........................................................................ 16

*Aumand v. Dartmouth Hitchcock Medical Center*,
   611 F. Supp. 2d 78 (D.N.H. 2009) ................................................................. 4

*Big Seven Music Corp. v. Lennon*,
   554 F.2d 504 (2d Cir. 1977) ......................................................................... 16

*Bouchat v. Baltimore Ravens Football Club, Inc.*,
   346 F.3d 514 (4th Cir. 2003) ......................................................................... 18

*Bridgmon v. Array Systems Corporation*,
   325 F.3d 572 (5th Cir. 2003) ........................................................................... 3

*Bruce v. Weekly World News, Inc.*,
   150 F. Supp. 2d 313 (D. Mass. 2001) ............................................................ 18

*CMM Cable Rep, Inc. v. Ocean Coast Properties, Inc.*,
   97 F.3d 1504 (1st Cir. 1996) ................................................................... 10, 12

*Computer Assoc. Intern. v. Altai*,
   982 F.2d 693 (2nd Cir. 1992) ........................................................................ 10

*Coquico, Inc. v. Rodriguez-Miranda*,
   562 F.3d 62 (1st Cir. 2009) .............................................................................. 9

*Creations Unlimited v. McCain*,
   112 F.3d 814 (5th Cir. 1997) ........................................................................... 9

*Data General Corp. v. Grumman Sys. Support Corp.*,
   36 F.3d 1147 (1st Cir. 1994) ................................................................... 16, 20

*Euromodos, Inc. v. Zanella, Ltd.*,
   368 F.3d 11 (1st Cir. 2004) .............................................................................. 2

*Feist Publications v. Rural Tel. Serv. Co.*,
   499 U.S. 340 (1991) ................................................................................. 11, 12

*GE Capital Healthcare Financial Services v. Fall River Walk-In Emergency Medical Office,
   P.C.*,
   2004 WL 40522 (D. Mass. Jan. 7, 2004) ........................................................ 2

*General Universal Systems, Inc. v. Lee*,
   379 F.3d 131 (5th Cir. 2004) ........................................................................... 9

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
   318 F. Supp. 1116 (S.D.N.Y. 1970) ............................................................... 13

*Geoscan, Inc. of Texas v. Geotrace Technologies, Inc.*,
   226 F.3d 387 (5th Cir. 2000) ......................................................................... 3

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
   471 U.S. 539 (1985).................................................................................... 16

*Lotus Development Corp. v. Borland Int'l, Inc.*,
   49 F.3d 807 (1st Cir. 1995)..................................................................... 10, 12

*Malletier v. Dooney & Bourke, Inc.*,
   525 F. Supp. 2d 558 (S.D.N.Y. 2007) ..................................................... 16, 18

*Matthews v. Freedman*,
   157 F.3d 25 (1st Cir. 1998)........................................................................... 11

*McKenzie v. Potter*,
   2004 WL 1932766 (D. Mass. Aug. 24, 2004) .................................................. 2

*Mendez-Soto v. Rodriguez*,
   334 F. Supp. 2d 62 (D.P.R. 2004)................................................................... 2

*Ortiz-Lopez v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de Puerto Rico*,
   248 F.3d 29 (1st Cir. 2001) ............................................................................ 4

*Stonkus v. City of Brockton Sch. Dep't*,
   322 F.3d 97 (1st Cir. 2003)............................................................................. 2

*Torrech-Hernandez v. General Elec. Co.*,
   519 F.3d 41 (1st Cir. 2008)......................................................................... 6, 9

*Wilson v. Bradlees of New England, Inc.*,
   250 F.3d 10 (1st Cir. 2001)............................................................................. 4

**Rules**

Fed. R. Civ. P. 56 ............................................................................................. 1

Local Rule 56.1 ................................................................................................ 1

## INTRODUCTION

Airframe cannot meet any of its threshold burdens.  To this day, Airframe has not proffered the source code it contends is infringed, let alone performed the requisite side-by-side comparison between its source code and the accused L-3 source code.  Airframe does not even have an expert who can perform such a comparison.

Airframe's opposition does not address any of these deficiencies.  Airframe failed to respond to L-3's statement of undisputed material facts, which are thus deemed admitted.  Airframe also failed to address the Court's Orders striking Airframe's expert and limiting its proof to its interrogatory response.  With no acknowledgment of these Orders, and with all relevant deadlines long passed, Airframe now offers (1) a new, previously undisclosed expert who provides (2) new, previously undisclosed theories of infringement.  Airframe's new, untimely, and precluded theories are no better than its original theories.  In short, Airframe's latest attempt to retool its case is too little, too late.

With respect to damages, Airframe concedes the legal principles in L-3's opening brief.  Airframe has offered no authority to support any aspect of its grossly inflated damages claim.  Nor has Airframe adduced even a scintilla of evidence to support its calculations.  Airframe's damage claim has no demonstrable legal or factual basis and should be dismissed.

## ARGUMENT

### A.     AIRFRAME FAILED TO DISPUTE L-3'S STATEMENT OF UNDISPUTED FACTS, WHICH ARE THUS DEEMED ADMITTED.

Fed. R. Civ. P. 56(e)(2) requires a party opposing summary judgment to set out specific facts showing a genuine issue for trial.  Local Rule 56.1 provides that a party opposing summary judgment file a "concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other

documentation." Failure to do so means that the facts are "deemed for purposes of the motion to be admitted" by the non-movant. *Id. See McKenzie v. Potter*, 2004 WL 1932766, at *1 (D. Mass. Aug. 24, 2004) (failure to comply with Local Rule 56.1 was grounds to deem movant's facts admitted) *citing Stonkus v. City of Brockton Sch. Dep't*, 322 F.3d 97, 102 (1st Cir. 2003).

Airframe submitted no counterstatement to L-3's statement (D.I. 85), and so "the facts proferred by [L-3] in its motion for summary judgment…are deemed admitted."[1] *GE Capital Healthcare Financial Services v. Fall River Walk-In Emergency Medical Office, P.C.*, 2004 WL 40522, at *3 (D. Mass. Jan. 7, 2004). Failure to provide a counterstatement "prevents the nonmovant from disputing the facts in the movant's statement of facts." *McKenzie* at *2, citing *Euromodos, Inc. v. Zanella, Ltd.*, 368 F.3d 11, 15-16 (1st Cir. 2004); *Mendez-Soto v. Rodriguez*, 334 F. Supp. 2d 62, 71 (D.P.R. 2004) ("A nonmovant's failure to present a statement of disputed facts, with specific citations to the record, justifies a court's deeming as admitted the facts presented in the movant's statement of undisputed facts").

The facts set forth in L-3's statement of material facts are dispositive because they establish that Airframe failed to adduce any of the evidence necessary to prove infringement. In particular, Airframe failed to proffer the contents of its allegedly copyrighted work (D.I. 85 ¶¶ 30, 33), failed to perform a side-by-side comparison of its work with any accused work (*id.* ¶¶ 32, 34-35), and failed to proffer any evidence to support proof of any damages (*id.* ¶¶ 36-52). Summary judgment for L-3 is warranted on this basis alone.

---

[1] Airframe also failed to provide such a statement when it opposed L-3's summary judgment motion in its previous litigation, *see* Case No. 07cv10142-WGY D.I. 53 at 9-10, and also failed to respond to any of L-3's Requests for Admission served in this case, *see* D.I. 70 at 9-10.

Rather than respond to L-3's statement of undisputed material facts (D.I. 85), Airframe instead offers only its own "statement of undisputed facts" in the body of its memorandum, in support of its "cross-motion for summary judgment" (D.I. 88). Because Airframe's motion was stricken as untimely, *see* June 8, 2010 Order, Airframe's statement in support of that motion should be of no effect. In order to insure a complete record, however, L-3 is filing a counterstatement to Airframe's statement and supporting exhibits contemporaneously with this reply brief.

**B.   AIRFRAME FAILED TO DISPUTE THE CRITICAL AND DISPOSITIVE LIABILITY ARGUMENTS RAISED IN L-3'S MOTION FOR SUMMARY JUDGMENT.**

In its opening brief, L-3 showed that Airframe cannot meet its burden to show liability,

*inter alia*, because:

(1) Airframe's designated expert, Steven Gans, is precluded from testifying by the Court's May 13, 2010 Order.  Airframe thus has no witness who can even sponsor the accused source code into evidence, let alone who can make the side-by-side expert comparison required to show that anything in that code is substantially similar to the copyrighted work.  (D.I. 82 at 6-7.)

(2) Airframe is limited to its barebones and wholly conclusory contention interrogatory response by the Court's May 13 Order, which is directed to the source code, and the source code only.  Despite this, Airframe has not identified a single line of allegedly infringing or infringed code.  No reasonable jury could find that Airframe has met its burden based on a single cursory and unsubstantiated allegation.  (D.I. 82 at 7.)

(3) Airframe failed to produce any evidence of the source code that is the subject of any one of its six copyright registrations, and thus as a matter of law cannot prove that any of its registered copyrights are infringed.  (D.I. 82 at 9-11.)

(4) Airframe's asserted copyright registrations are all invalid because Airframe's source code deposit was not the work for which registration was sought.  (D.I. 10 at n. 6.)

Airframe did not respond to ***any*** of these arguments.  Indeed, its Opposition does not even acknowledge the Court's May 13 Order, its stricken expert, or the contention interrogatory response that constrains its infringement theories.  Nor does Airframe counter the extensive authority requiring a copyright plaintiff to produce and rely on its registered copyrighted works to prove infringement of those works, *see, e.g., Bridgmon v. Array Systems Corporation*, 325 F.3d 572 (5th Cir. 2003), or to the case law holding copyright registrations on software invalid due to improper deposits*, see Geoscan, Inc. of Texas v. Geotrace Technologies, Inc.*, 226 F.3d 387, 393 (5th Cir. 2000).  Instead, Airframe attempts to repackage the expert report of its stricken expert, Mr. Gans, into an affidavit from Airframe's principal, Gordon Rosen.  This is Airframe's first attempted end-run around the Court's May 13 Order.  Airframe's second attempted end-run around that Order comes in the form of wholly new theories of liability, not

3

disclosed in the contention interrogatory response to which this Court limited Airframe.  None of this attempted backfilling cures the fatal defects raised in L-3's opening brief, to which Airframe has not even responded.  Summary judgment for L-3 is thus warranted on this basis as well.

### C.      THE COURT SHOULD STRIKE MR. ROSEN'S AFFIDAVIT AND ACCORDINGLY GRANT SUMMARY JUDGMENT BASED ON AIRFRAME'S LACK OF EVIDENCE.

Airframe's attempt to substitute Mr. Rosen as a testifying expert violates multiple Court Orders, as well as the Federal Rules.  Mr. Rosen's testimony—the principal source of evidence cited in Airframe's opposition—should be struck from the record for several independent reasons, explained in detail below:

> (1) Mr. Rosen was never disclosed as an expert, never provided an expert report, and thus offers improper expert testimony;
>
> (2) Mr. Rosen's declaration is not based on any evidence of record and lacks the necessary foundation necessary for a genuine dispute of material fact; and
>
> (3) Mr. Rosen's declaration is based primarily on materials received and analyzed in violation of the Protective Order.

Rule 26(a)(2) requires parties to timely disclose all experts; the Court ordered this disclosure by November 16, 2009. (8/20/09 Order.)  Mr. Rosen was never disclosed as an expert; nor did he ever serve a report disclosing any opinions, and thus his testimony should be struck. *See Ortiz-Lopez v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de Puerto Rico*, 248 F.3d 29 (1st Cir. 2001) (affirming dismissal of case where plaintiff failed to timely comply with Rule 26's automatic disclosure requirements regarding experts); *Aumand v. Dartmouth Hitchcock Medical Center*, 611 F. Supp. 2d 78 (D.N.H. 2009) (precluding defendant's employee from offering expert testimony because he was never disclosed under Rule 26).  *See also Wilson v. Bradlees of New England, Inc.,* 250 F.3d 10, 20 (1st Cir. 2001) ("Rule 37(c)(1)…requires the near automatic exclusion of Rule 26 information that is not timely disclosed.")  The expert that

4

Airframe *did* disclose is barred from testifying under this Court's May 13 Order, and Airframe's attempt to substitute Mr. Rosen as a testifying expert is a clear attempt to end-run that Order.

**First,** Mr. Rosen's Declaration constitutes expert testimony, and thus violates the Federal Rules, the Scheduling Order, and the Order barring Airframe's retained expert Steven Gans from testifying.[2]  The Declaration consists entirely of (1) expert testimony lifted, paraphrased, or repackaged from the stricken expert report of Mr. Gans (*e.g.* ¶¶ 52-61); (2) background technical information copied-and-pasted from the Wikipedia website (*e.g.* ¶¶ 4-9); and (3) wholly new theories of infringement never before articulated in any form by Airframe in this case (*e.g.* ¶¶ 26-51).  This is indisputably expert testimony.  As just one example, Mr. Rosen spends several pages claiming decades of experience in programming languages including both RPG-II and PHP, which he purports to apply in a comparative analysis of the background and histories of the two languages.  (*See id.* ¶¶ 1-15.)  L-3's expert had no opportunity to rebut this new expert disclosure, as it was served long after the exchange of expert reports and the close of discovery.[3]

Mr. Gans was prohibited from testifying because Airframe refused to produce him for deposition during the original discovery period, and continued to refuse to produce him during the extended discovery period as required by the Court's April 13 and 15 Orders.  (5/13/10 Order.)  Airframe's flouting of this Court's Orders with respect to Mr. Rosen is even more egregious.  Not only did Airframe refuse to produce Mr. Rosen for deposition at any time during

---

[2] On May 13, 2010, the Court ordered that there would be no "reconsideration of the source code."  L-3 submits that Mr. Rosen's attempt to offer a replacement opinion based on ***different*** source code than that produced in this case and reviewed and analyzed by the parties' respective experts constitutes a "reconsideration" of source code that should be struck by the Court.

[3] Mr. Rosen's Declaration is based only on 2008 source code he reviewed briefly in the prior Massachusetts case under supervision by an L-3 attorney at that attorney's office.  The parties agreed that the relevant source code for this case was that produced in December 2009.  Neither L-3's expert nor Airframe's designated expert Mr. Gans ever considered the source code upon which Mr. Rosen's declaration is based and thus it forms no part of the record in this case.

the original or extended discovery periods as ordered, but Airframe did not even disclose that it intended to rely on Mr. Rosen as an expert until its Opposition to the present motion.  Mr. Rosen's affidavit should thus be disregarded as untimely and as a violation of the May 13 Order.

**Second,** Mr. Rosen's Declaration lacks any proper record foundation and thus cannot create a genuine dispute of material fact.  *See, e.g., Torrech-Hernandez v. General Elec. Co.*, 519 F.3d 41, 47 (1st Cir. 2008) ("the District Court is not obliged to accept as true or to deem as a disputed material fact, each and every unsupported, subjective, conclusory, or imaginative statement made to the Court by a party.")  For example, Airframe puts great emphasis on Mr. Rosen's claimed recollection that the M3 source code files he inspected had creation and modification dates prior to 2004.  (*See* Opp. at 14-15.)  Mr. Rosen's claimed recollection is unsupported by any evidence, and thus insufficient to create a disputed fact issue.  None of the notes taken by Airframe during that inspection record any observation of the file modification or creation times.[4]  In fact, every file on the CD Mr. Rosen inspected shows a creation and modification date from late 2008.  Airframe's counsel insisted that both parties sign and date the CD during the inspection.  An image of that CD with both attorneys' signatures, as well as a list of files showing all modification dates were in 2008, is attached hereto as exhibits 4 and 5.[5]  Mr. Rosen is simply mistaken that any files bore older modification dates, and his unsupported recollection now does not establish a genuine fact dispute.[6]  *Torrech-Hernandez*, 519 F.3d at 47.

---

[4] L-3 can make these notes available to the Court for *in camera* inspection if necessary.

[5] Mr. Rosen's declaration is the first time that Airframe has contended that the files on the CD in question bore earlier modification dates.  Accordingly, the screenshot depicting these files is proper new evidence on reply.

[6] Mr. Rosen's recollection is unsupported by the record in several other instances, as well. For example, he claims that L-3 source code contained the statement "cannot determine use for capability in to not reset," *see* opp. at 3, 15. The inline note in question in fact states "note- reset to zero is always set to Yes - could not be determined a use for capability(in M3)to NOT reset so turned off thru out system."  Moreover, at his deposition, the M3 developer specifically explained why he wrote this note in the source code: "[U]pon converting the data in from the reports there was data in there that was not used, the nature of the, of the data was to perform the function or not and we had

Similarly, Mr. Rosen now claims to recall that he "personally observed approximately 600 programs from ARMS on the L-3 computer hard drive" seven years ago.  (D.I. 90 ¶ 22.)  Mr. Rosen's recollection on this point also lacks any record support.  The only evidence of record is a contemporaneous screenshot of the source code files at the time, showing only seventy-one files, which were promptly deleted in 2003 at Mr. Rosen's request.[7]  Mr. Rosen never before disclosed any recollection of "600 programs" in his multiple certifications in Airframe's Massachusetts and New York litigations discussing his discovery of the source code left by John Stolarz.  Nor has Airframe attempted to rebut the undisputed evidence that the small number of source code files left by Mr. Stolarz were destroyed shortly after they were discovered and long before the M3 work began.  (D.I. 83 Exs. 8, 9.)  Mr. Rosen's unsupported recollection, never disclosed before in any form in this case, cannot establish a triable issue.

In any event, neither the creation and modification dates of the files produced in the previous Massachusetts case nor the precise number of files left by John Stolarz are material facts for summary judgment.  Airframe failed to perform the required expert side-by-side comparison of source code, and thus it cannot meet its *Celotex* burden to show infringement.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-3 (1986) .

**Third**, while the Court may have accepted that the disclosure of this information to Mr. Rosen did not rise to the level of "the clear and undoubted disobedience of a clear and unequivocal order" (6/10/10 Order), L-3 nonetheless maintains that on principles of equity

---

no use for performing that function or not on the historical data nor on any new data, so we don't, the note was about not using that kind of a function at all on the historical data."   (Ex. 1.)  In other words, the "reset to zero" data which had been exported from ARMS and imported into M3 had no purpose in the new system, so was not used.

[7] Mr. Rosen also claims, without any support,  that the files listed on the hard drive of the Raytheon computer were different in the "DOS command mode" from those viewed in "Windows Explorer."  L-3 is unaware of any technical justification for this distinction, nor does Mr. Rosen provide any.

Airframe should not be permitted to rely affirmatively on information that even Airframe acknowledges Mr. Rosen was not permitted to access.[8]

Because Mr. Rosen's testimony constitutes improper expert testimony in violation of multiple Court Orders, the Court should strike his declaration. The vast majority of Airframe's purported "undisputed facts" rely on Mr. Rosen's declaration, as does Airframe's entire newly-disclosed infringement theory. (*See* D.I. 89 at 2-7, 9-16). With Mr. Rosen's declaration struck, Airframe has no evidentiary support for any argument, and summary judgment is warranted.

### D.   AIRFRAME'S NEW THEORY OF INFRINGEMENT IS PRECLUDED BY THE MAY 13 ORDER.

Airframe's Opposition also rests on an entirely new theory of infringement, which the May 13 Order precludes Airframe from offering. Airframe's case is limited to its contention interrogatory response. That response is limited to source code copying—i.e., the behind-the-scenes code that makes software function. *See* D.I. 83 Ex. 16 at 8: "Airframe observed that all or virtually of the 'M3' program is copied or otherwise translated from the Airframe source code."[9] Tacitly acknowledging that it has no case on that basis, Airframe in its Opposition tries to retool its case as being only about what the user sees, pointing to things such as reports, screens, and menus as evidence of alleged infringement. Although Airframe claims to provide examples of infringing source code, every single alleged similarity identified in its Opposition is in fact an element of menu, report, or data accessible by an ordinary user without recourse to any source code. These theories, and these bases for alleged infringement, were not disclosed in Airframe's contention interrogatory response, and thus are barred under the Court's May 13 Order.

---

[8] While L-3 did not make this argument in its motion for contempt, to the extent that L-3 needs to formally seek reconsideration of the Court's denial of its motion for contempt on the basis of this improper disclosure to Mr. Rosen (D.I. 94), L-3 respectfully does so here.

[9] Airframe also stated its response was based on a review of only a small portion – "12 percent" – of the M3 source code, and not on a side-by-side comparison of M3 source code with ARMS source code. (D.I. 83 Ex. 16 at 8.)

### E. AIRFRAME HAS FAILED TO SHOW ANY MISAPPROPRIATION OF PROTECTABLE EXPRESSION.

Airframe's new theory of infringement also fails to identify any misappropriation of any

***protectable*** expression.

#### 1. Airframe Failed to Show Any Misappropriation of Source Code.

Airframe of course has the burden to prove, *inter alia*, that the accused work is

"substantially similar" to protectable elements of the original work. *General Universal Systems,*

*Inc. v. Lee*, 379 F.3d 131, 142 (5th Cir. 2004).   To do so, Airframe must make "a side-by-side

comparison … between the original and the copy." *Id.* at 142, and show that the "copying of

copyrighted material was so extensive that it rendered the offending and copyrighted works

substantially similar." *Coquico, Inc. v. Rodriguez-Miranda,* 562 F.3d 62 (1st Cir. 2009)

(copyright owner must show extent of copying was "egregious").

There is no dispute on these applicable legal standards.   Yet nowhere in its opposition

does Airframe show that its witness made any side-by-side comparison of the ARMS source

code with the M3 source code.   Instead, Airframe rests wholly on conclusory allegations of

copying without any comparison of source code.   Such conclusory assertions are insufficient to

survive summary judgment. *Torrech-Hernandez*, 519 F.3d at 47.   None of the handwritten notes

Mr. Rosen relies on as support for the alleged copying actually contain any source code.

Moreover, the similarities reflected in those handwritten notes are limited to ***functional***

aspects of the software not protected by copyright. Specifically, Mr. Rosen claims that certain

functions in M3 are an "exact copy" of ARMS "equivalents," "including the same code and

sequence." (*See*, e.g., D.I. 90 ¶ 43.)   None of these allegations are substantiated.   All of the

similarities identified by Mr. Rosen are in fact only functional.   For example, he suggests that the

same numeric codes (e.g., "02" and "03") used in ARMS and M3 are associated with the same

aircraft maintenance events (e.g., "Suspend" and "Return to Stock" respectively).  (*Id.*)

Mr. Rosen's observation that the same numerical codes are associated with the same maintenance events is not evidence of source code copying; instead, it shows what is already undisputed: L-3 exported its government customer's data (the aircraft maintenance history) from the ARMS system and imported those same data into the newly created M3 system.  The idea of using the number 2 as a code for the event "suspend" is certainly not copyrightable.  *CMM Cable Rep, Inc*., 97 F.3d at 1518.  Indeed, *every* instance of alleged "copying" identified by Airframe is simply a functional parallel between the two programs that necessarily result from FAA requirements and the fact that L-3's government customer's historical aircraft data was exported from ARMS and imported into M3.

**2.  Airframe Failed to Show Misappropriation of Protectable Expression in Reports, Screens, Menus, or Maintenance Data.**

Even were Airframe permitted to substitute in a new theory at this late stage, it cannot meet its burden under *Celotex*.  *Celotex*, 477 U.S. at 322-3 ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case.").  It is well established that elements of a computer program that are incidental to its function are not protected by copyright.  *Computer Assoc. Intern. v. Altai*, 982 F.2d 693, 714 (2nd Cir. 1992); *Lotus Development Corp. v. Borland Int'l, Inc.*, 49 F.3d 807 (1st Cir. 1995).  In particular, copyright does not protect elements dictated by efficiency, elements dictated by external factors, or elements in the public domain.  *Altai*, 982 F.2d at 708.

In all of Mr. Rosen's comparisons of ARMS and M3 reports, screens, and menus, he did not even attempt to show that any similarities were anything other than functional.  To the contrary, his statements confirm that the alleged misappropriation is fundamentally one of *ideas*,

10

which are simply not protectable by copyright, as a matter of black-letter law.  See, e.g., D.I. 90 ¶

15: "While a comparison of written Chinese and English do not look the same visually, but they

can be **functional equivalents, used to express the same ideas or concepts**" (emphasis added).

Here, Airframe has no evidence to show that any alleged similarities in reports, screens, and

menus, are attributable to anything other than the fact that ARMS and M3 perform similar

aircraft tracking functions based on similar constraints, namely: the FAA rules that govern

aircraft maintenance, and that are based on the same data, namely the Government's historical

aircraft maintenance data that L-3 properly and lawfully imported into its new system.

(a)    <b>Airframe Has Shown No Misappropriation of Output Reports.</b>

Airframe has shown no misappropriation of protectable expression in any output reports

generated by M3.  For example, Mr. Rosen references several reports including a rotatable chain

list, a "squawks" report, a maintenance task card, inspections reports, maintenance history, and

projection of maintenance.  He alleges generally that M3 "copies" ARMS without providing any

specific analysis, referring only to the exhibits to his declaration.  Mr. Rosen does not identify

any portion of the report that is ***expressive*** rather than merely functional, and thus protectable by

copyright.  Mr. Rosen fails to acknowledge that much of the information contained in the report

is dictated by FAA requirements and the data set.[10]  In sum, Airframe has not identified any

alleged misappropriation of any *expressive* content from ARMS reports.

(b)    <b>Airframe Has Shown No Misappropriation of Menus.</b>

To the very limited extent Mr. Rosen identifies similarities in the menu structures

between ARMS and M3, such menu structures are also not subject to copyright protection under

---

[10] Indeed, Airframe's position apparently is that L-3 has the burden to show that elements from the reports are functional rather than expressive.  (Opp. at 17.)  In fact, Airframe must show in the first instance that any alleged copying was of expressive material protected by copyright law.  *Feist Publications v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Matthews v. Freedman*, 157 F.3d 25, 27 (1st Cir. 1998).  Airframe has not even attempted to do so.

well-established First Circuit law. *Lotus*, 49 F.3d at 819 ("We hold that the Lotus menu command hierarchy is uncopyrightable subject matter"). Indeed, in *Lotus*, the defendant did not contest that it had made "a virtually identical copy of the entire [] menu tree" from the plaintiff's software, *id* at 810, an act which the First Circuit held to be noninfringing. Here, the M3 menus are indisputably quite *dissimilar* to those in ARMS. If a "virtually identical copy" of menu structures did not constitute an infringing act in *Lotus*, the isolated similarities (and many differences) between M3 and ARMS menus could not constitute infringement either.

(c)    **Airframe Has Shown No Misappropriation of Column Headings.**

Mr. Rosen also puts great weight on ARMS column headings and abbreviations for which similar phrases appear in M3. For example, Mr. Rosen claims that L-3's use of the hyphenated phrases "ONE-TIME" and "RE-SET" are infringing copies. (*See* D.I. 90 ¶¶ 34-35.) Even were these hyphenated terms original to Airframe's software, they are simply not subject to copyright protection. *CMM Cable Rep, Inc. v. Ocean Coast Properties, Inc.*, 97 F.3d 1504, 1519 (1st Cir. 1996) ("It is axiomatic that copyright law denies protection to fragmentary words and phrases"). Here too Airframe has not shown that any column headings, abbreviations, or other isolated terms are *expressive*, and thus protectable under copyright law.

(d)    **Airframe Has Shown No Misappropriation of Maintenance Data.**

Finally, the historical aircraft maintenance data that L-3 imported into M3 are also purely functional and not protectable expression. *Feist*, 499 U.S. at 341 ("copyright protection extends only to those components of the work that are original to the author, not to the facts themselves"). These data are pure facts, namely, the maintenance history of each of L-3's customer's airplanes. Moreover, these data were not created by Airframe and do not belong to Airframe. They are the property of L-3's government customer and do not support any claim of

misappropriation by Airframe.

**F.     AIRFRAME HAS FAILED TO SHOW ANY TRIABLE ISSUE EXISTS ON DAMAGES.**

**1.     Airframe Has Conceded Its Failure to Meet Its Burden on Damages on Both the Law and the Facts.**

In its opening brief, L-3 showed that Airframe has not met its burden to show damages because its damages theory has no basis in the Copyright Act (D.I. 82 at 15), ignores the statutory distinction between actual loss and lost profits (*id*. at 16), and has no factual support in industry standards or Airframe's own historical licensing practices (*id*. at 16-17).  L-3 also demonstrated that Airframe could provide no proof that *any* L-3 revenue was attributable to the alleged infringement, a required showing under *Davis*, and that no AM&M revenue was related in any way to use of M3.  (*Id*. at 15-16, 20.)  Airframe does not address *any* of these points in its opposition, *see* opp. at 18-23, and thus concedes them.  For this reason alone, the Court should grant summary judgment of no damages.

Airframe cites only a single damages case in its opposition: *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) (opp. at 8).  Airframe offers no showing that *Georgia-Pacific*, a patent case, is relevant authority in copyright litigation in general, nor has it provided either legal or factual analysis to show that *Georgia-Pacific* principles were actually applied as any part of its expert's damage methodology.

Airframe's only response on damages rehashes the arguments already rejected by this Court in Airframe's sanctions motion.  (*See* D.I. 80 and 6/8/10 Order).[11]  Specifically, Airframe is now attempting to change the subject matter of his case to something that has no relation to

---

[11] In its June 8, 2010 Order, this Court ruled that L-3 may not call Robert Spivey as a witness at trial, presumably because Airframe did not have an opportunity to depose him, but otherwise denied Airframe's motion for sanctions. The Court has thus barred Airframe's attempt to refashion its case, post-discovery, into one about software other than the accused M3 system.

either the accused M3 software or to its claim of copying.  This attempted change of direction,

long after the close of discovery, cannot serve to create a genuine disputed material fact.

Airframe explicitly admits its change of target when it contends in its Opposition that

"the Complaint is not limited to damages from use of M3 only."  (Opp. at 18.)  Airframe is

wrong.  First, M3 is the only software named in the Complaint, and indeed Airframe has never

had any basis whatsoever to pursue a claim against any other software.  See D.I. 4 at 12-16

(Count VIII entitled "'M3' Program Infringement" and Count IX entitled "Contributory

Infringement via disclosure of the M3 program to the United States Government").  Second,

Airframe is limited by this Court's May 13 Order to the proof and theories disclosed in its

contention interrogatory response.  That response specifically accuses M3 and no other software.

(*See* D.I. 82 at 12.)

Airframe's attempt to resist summary judgment by speculating about software that was

never previously accused and that has no relationship to M3, such as "WECMS" and "BED," is

classic misdirection.  Airframe has no basis to include these programs.  Nor has it proffered any

actual evidence to create a disputed fact.  Its response is nothing more than baseless speculation

that new exploration of software that has never been at issue in this case might bear fruit.  To the

contrary, the WECMS and BED software programs are merely proof that L-3's AM&M

accounting segment uses software other than the accused M3, along with third-party commercial

and military software, and thus further evidence that Airframe's reliance on AM&M revenue is

wholly speculative.  Because Airframe fails to offer any substantive response to any of the points

raised in L-3's opening brief, and further because Airframe offers no evidence in opposition, the

Court should grant summary judgment of no damages.

**2.    Airframe Fails to Distinguish Actual Loss from Infringer's Profits or Base Any Calculation on Actual Use of the Accused Software.**

To meet its burden as to damages, Airframe was required to proffer separate calculations of actual damages and reasonably related profits. *Davis*, 246 F.3d at 159 ("It is important that these two categories of compensation have different justifications and are based on different financial data."). It did not do so. Nowhere in opposition papers does Airframe dispute that its "expert witness made no separate calculations of actual damages and profits based on actual use of M3," as stated in L-3's statement of material facts. (D.I. 85 ¶ 50.) Airframe's expert offered only a single estimate—for "damages" (D.I. 83 Ex. 7 at 23)—having stated in his report that he was "unable to determine the percentage of the infringer's operating profit attributable to the software" (*Id.* at 16.).[12]

Airframe does not dispute that its damage calculation does not include any of the revenues or profits from actual use of M3 (D.I. 85 ¶¶ 48-49). Nor does Airframe attempt to show that M3 has been used in any business unit reporting revenue through the AM&M accounting segment. Indeed, it is undisputed that M3 was not used in any such business unit. (D.I. 85 ¶ 43.)

Because Airframe's damage theory lacks any legal support and bears no resemblance to the infringement damages assessment required by the Copyright Act, summary judgment of no damages is appropriate.[13] *See Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 679

---

[12] L-3, by contrast, has offered evidence of this amount, which Airframe has not disputed: "Proprietary Programs had two annual contracts with its government customer relating to aircraft maintenance tracking since April 2009. One contract was to maintain and upgrade M3, the other to perform maintenance tracking for the small number of aircraft in the government customer's program. Revenues from these contracts were $569,606 and $1,909,554 respectively ($2,479,160), resulting in profits of $88,952 and $415,991, a total of $504,943." D.I. 85 ¶ 46.

[13] Nor does Airframe's damages calculation apply to the relevant time period still at issue in this matter, as determined by the Court; nor was his estimate ever intended to apply to the relevant period. Mr. Chodor made no calculation of damages for the period beginning April 7, 2009, and made clear in his deposition that he had no intention of so limiting his estimate. (D.I. 83 Ex. 19 at 109: 2-4, 15-17) Airframe has not disputed this fact.

(S.D.N.Y. 2007) (District Court has "gatekeeper function" to exclude unreliable expert testimony on damages; plaintiff is required "to prove that its expert has used reliable methods in a reliable manner...an expert's testimony must fit the substantive law and the facts of the case...questions of weight, when sufficiently accumulated, become so serious as to require exclusion.").

### 3.   Airframe Fails to Show Any Causal Relationship for Actual Damages.

As L-3 showed in its opening papers, to prove actual damages, Airframe must show a causal relationship between the alleged infringement and the claimed loss. *See, e.g., Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 567 (1985). Airframe must prove both "but-for" causation – that the infringement caused Airframe to lose business, *see Data General Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1170-71 (1st Cir. 1994), and proximate causation – that there was "a necessary, immediate and direct causal connection *between the wrongdoing and the damages*" rather than the primary cause of the loss being other factors. *Big Seven Music Corp. v. Lennon*, 554 F.2d 504, 509 (2d Cir. 1977) (emphasis added). Airframe has done neither.

(a)   **Airframe Does Not Dispute that No Evidence Shows M3 Was Used in AM&M, the Only Business Unit on Which Airframe Bases Its Damages Theory.**

L-3's showed in its statement of undisputed facts that no AM&M business had access to or used M3 in any way, and that reports of AM&M revenues did not include any generated by use of M3. (D.I. 85 ¶¶ 41-44, 47-49). Airframe admits these undisputable facts by failing to offer a counterstatement as required by the Local Rules.

Aside from its procedural failure to respond, Airframe can proffer no evidence to show that any part of AM&M revenues related to use of M3. Airframe's entire damage claim, which is based ***only*** on AM&M revenues, is thus speculative in its entirety and should accordingly be dismissed. *See, e.g., Abeshouse v. Ultragraphics, Inc.*, 754 F.2d 467, 471 (2d Cir. 1985)

16

(holding damages claim "too speculative to support any award of actual damages").

(b)     **Airframe Does Not Dispute that Its Damages Calculation Has No Basis in a Hypothetical Negotiation.**

Airframe does not dispute that it failed to apply the relevant analysis for copyright damages including "the amount of the reasonable licensing fee [plaintiff] likely would have received from [defendant] for [the infringing] uses had the parties reached a fee agreement." *Bruce v. Weekly World News, Inc.*, 310 F.3d 25, 29 (1st Cir. 2002) ("*Bruce II*").  *See* D.I. 85 ¶ 51: "Airframe's expert witness expressed no conclusion which identified his calculation of damages as representing the product of a hypothetical negotiation between ASI and L-3 among the four methodologies his report discussed."  Because Airframe concedes this critical point, summary judgment of no damages is appropriate.

(c)     **Airframe Does Not Dispute that Its Damages Calculation Has No Basis in Its Own Historical Licensing Practices.**

Airframe's opposition ignores the best evidence of a hypothetical negotiation between it and L-3: Airframe's actual licensing history.  In the course of a twenty-year licensing history between the parties, Airframe does not dispute that it never charged L-3 or its predecessors more than a flat software license fee of $10,000 annually.  Nor does Airframe dispute that it never charged licensing fee based on *any* customer's revenues.  Finally, Airframe admits these critical facts form no part of Airframe's damage calculation. *See* D.I. 85 ¶ 51.  Dismissal of Airframe's damages claim is appropriate since it is contrary to two decades of license terms which govern a hypothetical fee negotiation and exclude a claim of fees based on customer revenues.

(d)     **Airframe Does Not Dispute that Its Damages Calculation Has No Basis in Industry Practice.**

Like licensing history, "proof of industry practice inarguably is crucial to the estimation of actual damages" by determining a hypothetical negotiated license fee. *Bruce II*, 310 F.3d at 29-30.  By contrast, where a damages theory is so far-fetched that "given the prevailing industry

17

practice, there [is] no realistic prospect whatsoever" that plaintiff could negotiate the

hypothetical license it proposed, it should be rejected.  *Id.*  Here, Airframe's damage calculation

was based on the entire $2.6 billion revenues of the AM&M division, but, as L-3 showed in its

opening papers, "There is no evidence in the record that the airline industry typically license

aircraft maintenance software based on a customer's net revenue. ASI's expert witness testified

that his damage calculation did not reflect typical licensing practices in the airline industry," D.I.

85 ¶ 40. Indeed, Airframe's own expert admitted that the "typical" fee was based on a per-

airplane charge, and further that he explicitly failed to consider this practice in his analysis.  (*See*

D.I. 82 at 17.)  Airframe's admission of these facts is another critical failure to meet its burden

on damages.  Because Airframe's damages calculation lacks both factual and legal support,

summary judgment of no damages is appropriate.  *See Malletier v. Dooney & Bourke,* 525 F.

Supp. 2d at 679.

### 4.      Summary Judgment Should Be Granted Denying Airframe Any Profits.

#### (a)      Airframe Does Not Dispute that It Has Not Shown Any Revenue Attributable to the Alleged Infringement.

To recover infringer's profits, a plaintiff must present evidence of ***only*** the portion of the

infringer's revenues that are "reasonably related to the infringement, not unrelated revenues."

*Bruce v. Weekly World News, Inc.*, 150 F. Supp. 2d 313, 320 (D. Mass. 2001). If it fails to do so,

summary judgment on profits is warranted.  *See Davis*, 246 F.3d at 157, 160, 161 (dismissing

profits claim based on total revenues, instead of reasonably related revenues).  Gross revenues

are expressly ***not*** an adequate basis for a calculation of profits.  *See Bouchat v. Baltimore Ravens*

*Football Club, Inc.*, 346 F.3d 514, 520-23, 526 (4th Cir. 2003) (plaintiff must show causal link

between infringement and ***particular*** profit stream).

Airframe's entire damages calculation is based on L-3's 2008 10-K report of $2.657

billion in net sales revenues for the AM&M Reportable Segment (D.I. 85 ¶ 37.), a fact which

Airframe concedes.  (Opp. at 8.)  But Airframe has failed in its Opposition to show any causal

link exists between the M3 software and the ***particular profit stream*** traced to AM&M – i.e.,

that AM&M's profit stream is reasonably related to the alleged infringement.  Airframe offers no

proof whatsoever that any AM&M business had access to or use of M3, or that any (much less

all) of AM&M's revenues was in any way related to M3 or Airframe's infringement claims.

Furthermore, by failing to dispute any of the following facts showing the lack of relationship

between M3 and AM&M's gross revenues, Airframe has admitted them:

- M3 has been used by L-3 only within the Proprietary Programs unit of L-3's Mission Integration Division and only for its government customer.  D.I. 85 ¶¶ 41, 44.

- L-3's Mission Integration Division does not report revenue through L-3's AM&M reportable segment in L-3's 10k filings.  D.I. 85 ¶ 42.  Nor has M3 ever been used by any business unit reporting revenue through AM&M.  AM&M businesses use commercial, military or proprietary software to track aircraft maintenance – not M3.  Net Revenues reported by L-3's AM&M reportable segment in the L-3 2008 10K did not include revenues generated by use of M3.  D.I. 85 ¶ 43.

- Proprietary Programs had two annual contracts with its government customer relating to aircraft maintenance tracking since April 2009.  Revenues from these contracts totaled ($2,479,160), resulting in profits of $504,943.  D.I. 85 ¶ 46.

- Airframe's expert witness made no calculation of profits based on use of M3.  D.I. 85 ¶ 48.  His damages calculation was not based on the revenue and profit figures based on actual use of M3 by Proprietary Programs.  D.I. 85 ¶ 52.

- Airframe's expert witness made no calculation of actual damages based on use of M3.  He testified that his report assumes AM&M businesses used M3 because he used AM&M revenues as the basis of his calculation.  D.I. 85 ¶ 49.

These undisputed facts show that no AM&M businesses have ever used M3 or received

any revenues by such use. Because Airframe has failed to present evidence of the portion of the

infringer's revenues that are "reasonably related to the infringement," any claim for profits

should be dismissed.  *See Davis*, 246 F.3d at 157, 160-1.  And because Airframe's damages

expert has no legal or factual basis for his opinion, which is designed only to create the

appearance of a "lucrative calculation," it should be excluded in its entirety. *See Bruce II* at 31.

### 5.      Airframe Misrepresents Hector Arce's Testimony.

Rehashing arguments that were already rejected in its sanctions motion, Airframe states

(opp. at 8) that L-3's 30(b)(6) damages witness Hector Arce has no knowledge of the use of

aircraft software usage in AM&M and thus "provided no basis for limiting the damage claim,"

citing several pages of his deposition testimony in which he made no such statement.

Airframe's approach fundamentally mistakes its burden of proof under the law.

Airframe's position seems to be it can simply assume infringement everywhere in the company

based on no evidence whatsoever, and that it is L-3's burden to prove the extent of nonuse.  This

is not the case.  *Data General Corp.*, 36 F.3d at 1170 (holding that copyright plaintiff bears

burden on damages).  Airframe adduced no evidence of use of M3 outside of the Proprietary

Programs group in Greenville, Texas, and thus has not met its *Celotex* burden on this point.

In any event, L-3, through its 30(b)(6) witness, produced ample evidence to rebut

Airframe's unfounded assertions.  Mr. Arce produced his affidavit dated April 21, 2010 (Ex. 2)

at his deposition, in which he specifically identified and detailed the aircraft maintenance

software used by each of the several AM&M businesses.  None of them uses M3.

Mr. Arce was questioned at length about the tracking software used at each of these

AM&M installations in his deposition at p. 60-64, 91-101 (Ex. 3). The testimony cited by

Airframe merely states that Mr. Arce had not reported on tracking software ***other than*** in the

AM&M reporting segment business, and in Mission Integration Division Proprietary Programs

which used M3 (Ex. 3 at 57-58; 66-67; 144-5).  His testimony thus confirmed that M3 was not

used by AM&M business at any of its locations.

## **CONCLUSION**

For the above-stated reasons, the Court should **GRANT** L-3's Motion for Summary

Judgment in its entirety.


Dated:  June 21, 2010                            /s/ Adam J. Kessel_____
                                                 Kurt L. Glitzenstein (BBO # 565312)
                                                 Adam J. Kessel (BBO # 661211)
                                                 Danni Tang (BBO# 669563)
                                                 FISH & RICHARDSON P.C.
                                                 225 Franklin Street
                                                 Boston, MA  02110-2804
                                                 (617) 542-5070 Telephone
                                                 (617) 542-8906 Facsimile

                                                 Attorneys for Defendant
                                                 L-3 Communications Corporation


Of Counsel

Alan M. Gelb (AG 4254) admitted *pro hac vice*
Kirstin Peterson (KP 6850)
JONES HIRSCH CONNORS & BULL P.C.
Attorneys for Defendant
L-3 Communications Corporation
One Battery Park Plaza
New York, New York 10004
Phone: (212) 527-1000
FAX: (212) 527-1680

## **CERTIFICATE OF SERVICE**

I hereby certify that L-3'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR

SUMMARY JUDGMENT, filed through the ECF system, will be sent electronically to the

registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies

will be sent to those indicated as non-registered participants on this 21st day of June, 2010.

/s/ Adam J. Kessel
Adam J. Kessel