```
0001
 1
 2   UNITED STATES DISTRICT COURT
 3   DISTRICT OF MASSACHUSETTS
 4   ------------------------------x
 5   AIRFRAME SYSTEMS, INC. f/k/a    :
 6   AIRLINE SOFTWARE, INC.,         :
 7                  Plaintiff,       :
 8        -against-                  : Case No.
 9   RAYTHEON COMPANY,               : 1:08-cv-11940-WGY
10   and L-3 COMMUNICATIONS          :
11   CORPORATION,                    :
12                  Defendants.      :
13   ------------------------------x
14                  March 25, 2010
15                  11:20 a.m.
16
17        Deposition of LAWRENCE R. CHODOR, held at
18   the law offices of Jones Hirsch Connors & Bull P.C.,
19   1 Battery Park Place, 28th Floor, New York,
20   New York, before Susan B. Ratner, a Shorthand
21   Reporter and Notary Public within and for the
22   State of New York.
23
24
25
0002
 1
oPž`û_H_
 2   A P P E A R A N C E S:
 3
 4   BRUCE I. AFRAN, ESQ.
 5   Attorney for Plaintiff
 6       10 Braeburn Drive
 7       Princeton, New Jersey 08540
 8
 9   JONES HIRSCH CONNORS & BULL P.C.
10   Attorneys for Defendant Raytheon Company
11       1 Battery Park Plaza - 28th Floor
12       New York, New York 10004
13   BY:  ALAN M. GELB, ESQ.
14
15   FISH & RICHARDSON P.C.
16   Attorneys for Defendant L-3 Communications
17   Corporation
18       225 Franklin Street
19       Boston, Massachusetts 02110
20   BY:  ADAM J. KESSEL, ESQ.
21
22
23
24
25
```

```
0106
 1                L. Chodor
 2           MR. AFRAN:  I object to the form.
 3      A.   I don't recall.
 4      Q.   You don't recall any such opinion,
 5   correct?
 6           MR. AFRAN:  Excuse me, but that is not
 7      what he said.
 8           Please don't characterize the testimony.
 9           MR. GELB:  I asked him another question,
10      if that has evaded you.
11           MR. AFRAN:  It has not evaded me.
12      Q.   Is it correct that you cannot recall
13   expressing an opinion on a nine-figure damage
14   amount other than this one?
15      A.   I don't recall whether I have expressed
16   a damage amount close to nine figures.
17      Q.   Very well.
18           Can you tell me, please, who selected
19   the period beginning January 1, 2006 and ending
20   December 31, 2009 as the period for which you
21   would express a damage opinion?
22      A.   I was advised to use that period by
23   general counsel, Stan Rand.
24      Q.   Did he give you that advice in writing?
25      A.   No.
0107
 1                L. Chodor
 2      Q.   When did he give you that advice?
 3      A.   Early on in the assignment.
 4      Q.   When, in relation to the date of your
 5   engagement under the letter of October 15, 2009,
 6   signed by Mr. Rosen on 3 November 2009?
 7      A.   Is that an exhibit or --
 8      Q.   Yes.
 9      A.   Please tell me which exhibit that is.
10      Q.   That is appendix G.
11      A.   Thank you.
12      Q.   It's the last appendix, the last
13   documents that are part of Exhibit 1.
14      A.   I don't recall the exact date.
15   Somewhere early on in the engagement, probably
16   within the first month or so.
17      Q.   After the letter, appendix G, correct?
18      A.   Correct.
19      Q.   Are you aware, sir, that Judge Young,
20   who presides in this case, has dismissed
21   Airframe's damage claims prior to April 7, 2009?
22      A.   I may have read something in one of the
23   complaints or one of the court documents to that
24   effect.
25      Q.   If he dismissed the damage claims prior
0108
 1                L. Chodor
 2   to April 7, 2009, can you tell me why you would
 3   have expressed an opinion on damages for the years
 4   and periods prior to that?
```

```
 5      A.   That would have had no impact on my
 6  opinion.
 7           I was advised by Mr. Rand to calculate
 8  the damages for that period, from January 1, '06
 9  through December 31, '09.
10      Q.   If damage claims have been dismissed, do
11  you understand that they may not be made in the
12  case?
13      A.   That had no impact on my assignment.
14           My assignment was to calculate the
15  damages for that four-year period.
16      Q.   That assignment is not in writing,
17  correct?
18      A.   The assignment --
19      Q.   The assignment to calculate damages for
20  that period is not in writing, correct?
21      A.   That is correct.
22      Q.   Is there any basis on which we can
23  divine from the content of Exhibit 1 what the
24  damages are for the period April 9, 2009 and
25  thereafter?
0109
 1                L. Chodor
 2           Can we tell what your opinion is, if you
 3  have one, on what the damages are for that period
 4  which remains in the case?
 5      A.   The validity of my calculation of
 6  damages would be unchanged.
 7           If your question is, could those damages
 8  be allocated within that period, some calculation
 9  could be done.
10      Q.   But it doesn't appear in the document as
11  it presently stands, correct?
12      A.   That is correct, because my assignment
13  was to calculate the damages for the four-year
14  period.
15      Q.   If you made such a calculation, it would
16  represent work product not performed or reflected
17  in Exhibit 1.
18      A.   That is correct.
19      Q.   Do you understand that Airframe was not
20  the only company offering aircraft maintenance
21  tracking software during the period covered by
22  Exhibit 1?
23      A.   Are you telling me that there are other
24  companies who do that, or are you asking me if I
25  know of any other companies?
0110
 1                L. Chodor
 2      Q.   Do you know whether other companies,
 3  other than Airframe, offer software to perform the
 4  same or similar functions?
 5      A.   Yes, I do.
 6      Q.   Are you able to describe the universe of
 7  those competitive companies; how many, for
 8  example?
 9      A.   I don't know exactly how many there are
```

```
10   or even approximately how many there are.
11       Q.  Do you know of any basis for comparison
12   as to the quality or performance of the
13   competitive softwares with Airframe software?
14       A.  No, I do not.
15       Q.  Would the quality of competitive
16   software and their performance be a factor in
17   assessing what Airframe could be expected to
18   achieve in a negotiation with a customer?
19       A.  Yes.
20       Q.  What effect would quality of competitive
21   software have on the rates?
22       A.  Well, in a hypothetical negotiation, one
23   of the factors would be what competitors there
24   are, what their prices are.  That would certainly
25   enter into a hypothetical negotiation.
0111
 1                L. Chodor
 2       Q.  Have those qualities of competition been
 3   reflected anywhere in your analysis in Exhibit 1?
 4       A.  Yes, they have.
 5       Q.  Show me where.
 6       A.  They are a consideration --
 7       Q.  Show me where they are articulated in
 8   your analysis in Exhibit 1.
 9           MR. AFRAN:  Excuse me, Mr. Gelb, he was
10       speaking.  Please don't interrupt him.
11       A.  They are part of my expert process in
12   determining what a reasonable royalty rate is.
13           They are not articulated by name, if
14   that is what you are asking, within my report.
15       Q.  Is a competitive analysis articulated in
16   the report?
17       A.  I'm going to look in the report and I
18   will give you an answer.
19       Q.  Good.
20           MR. AFRAN:  I object to the form of the
21       question.
22       A.  Page 13, the last sentence, I will read
23   it, "As a result, the hypothetical negotiation
24   considers specific circumstances such as financial
25   position, competitive strategies and market
0112
 1                L. Chodor
 2   position."
 3       Q.  Whose financial position, the copyright
 4   owner or the infringer?
 5       A.  Both parties.
 6       Q.  The competitive strategies of the
 7   copyright owner and the infringer as well?
 8       A.  Correct.
 9       Q.  And the market position of the copyright
10   owner and the infringer as well?
11       A.  Correct.
12       Q.  Then where are the competitor qualities
13   and rates assessed here, since none of them are
14   included in this paragraph, as you have just told
```

```
15  us?
16       A.   As part of my analysis I look at royalty
17  agreements.  I like to see if I can get any
18  financial data on competitors.
19            I was unable to come up with actual
20  license agreements for competitors.
21       Q.   Shall we understand, then, that this
22  opinion of yours does not represent an assessment
23  of what the market for competitive software would
24  produce in such a negotiation compared to ASI
25  standing alone?
0113
 1                L. Chodor
 2            THE WITNESS:  Would you read back the
 3       question, please.
 4            (Question read.)
 5            MR. AFRAN:  I object to the form.
 6       A.   No, that is not true.
 7       Q.   Well, then, where is that topic
 8  commented on or assessed in your opinion?
 9            THE WITNESS:  Would you read the
10       question back, please.
11            (Question read.)
12       A.   In order to put my report together and
13  to assess reasonable royalties, I consider what
14  information is available.
15            Other than some articles about aircraft
16  maintenance software, which indicates some ranges,
17  there were no specific agreements that I was able
18  to come up with, so I considered what I had read
19  about the industry in determining the reasonable
20  royalty rate.
21       Q.   Did you reflect those considerations on
22  some page of the report?
23       A.   No.
24            Those considerations are not reflected
25  on a specific page.
```

```
0303
 1                    L. Chodor
 2   Mr. Rand?
 3        A.   Yes.
 4             I discussed Exhibits 7, 8, and 9.
 5        Q.   Did you discuss what they showed in
 6   relation to the issues on which you are being
 7   examined?
 8             MR. AFRAN:  I object to the form.
 9        A.   Yes.
10        Q.   Did you discuss the possible testimony
11   that you would give on a continued examination
12   relative to these exhibits?
13        A.   Yes.
14        Q.   Give me the substance of the discussion,
15   what did counsel say to you, and what did you say
16   to him about what the documents showed?
17        A.   To summarize, counsel asked if this had
18   any impact on my opinion, and my conclusion, and I
19   said that it did.
20        Q.   Did counsel discuss what that impact
21   might be on the testimony that you would give?
22        A.   Yes.
23        Q.   Did he help you to formulate answers to
24   the questions that you would likely give on that
25   subject?
0304
 1                    L. Chodor
 2        A.   No.
 3        Q.   Did you discuss what your answers might
 4   be on that subject?
 5        A.   We did.
 6        Q.   Let's look at the exhibits.
 7             Exhibit 7 is the Kenneth Gaylor
 8   affidavit.
 9             You have read it now, correct?
10        A.   I have.
11        Q.   He says in paragraph 2 that when he
12   joined Proprietary Programs as part of the MID
13   division, "...M-3 was being developed for and at
14   the sole expense of its sole customer - the 645th
15   Aeronautical Systems Squadron...," defined as the
16   "government customer."
17             You understand that?
18        A.   I do.
19        Q.   Do you have any basis for disputing that
20   M-3 was developed for and at the sole expense of
21   this government customer?
22             MR. AFRAN:  I object to the form.
23             THE WITNESS:  Read the question back,
24        please.
25             (Answer read.)
0305
 1                    L. Chodor
 2        A.   I do.
 3        Q.   What is that?
 4        A.   I have no basis for believing or
```

```
 5   disbelieving this affidavit.
 6      Q.   Very well.
 7           He continues, "In or about June, 2006 M3
 8   went into operation as a maintenance tracking
 9   facility used only for the government customer by
10   L-3 Proprietary Programs, and for no other
11   customer of this or any other business or
12   financial reporting group of L-3 Communications
13   Corporation ('L -3')."
14           Have you any basis for disputing that
15   statement?
16      A.   I do.
17      Q.   What is the basis?
18      A.   I have no basis for believing or
19   disbelieving.
20      Q.   He says he has personal knowledge of the
21   facts set forth in the affidavit.
22           You say to us you have no knowledge at
23   all; is that correct?
24      A.   That is correct.
25      Q.   "Of all business divisions and entities
0306
 1                L. Chodor
 2   in L-3, only Proprietary Programs has access to
 3   and use of M3."
 4           Do you see that, at the end of
 5   paragraph 2?
 6      A.   I do.
 7      Q.   Do you have any basis for disbelieving
 8   that statement?
 9      A.   I have no basis for disbelieving or
10   believing that statement.
11      Q.   He continues at the top of page 2, "In
12   particular, M3 has not been used by the L-3 AM&M
13   business reporting division which has no access to
14   M3 or use of M-3 in any way."
15           Do you have any basis to disbelieve that
16   statement?
17      A.   I have no basis for believing or
18   disbelieving that statement.
19      Q.   "M-3 cannot generate and has not
20   generated any revenues for the AM&M business.  The
21   ASI 'expert' damage report which assumes to the
22   contrary is simply and wholly incorrect in that
23   regard."
24           Do you have any basis to disbelieve that
25   statement?
0307
 1                L. Chodor
 2      A.   I have no basis for believing or
 3   disbelieving that statement.
 4      Q.   Certainly, there is no basis in your
 5   report to show that this statement is incorrect;
 6   is that right?
 7           MR. AFRAN:  I object to the form.
 8           That is really cross-examination and
 9      argumentative.
```

```
10      Q.   Go ahead.
11           THE WITNESS:  Read it back one more
12      time, please.
13           (Question read.)
14      A.   That is correct.
15      Q.   If you assume the facts as recited in
16   the affidavit, and as reviewed by us in the past
17   few minutes, to be correct, are you prepared to
18   say that there was not a basis for you to
19   attribute all of the AM&M revenues to the use of
20   M-3?
21      A.   No.
22      Q.   If you assume the correctness of the
23   facts we have just reviewed, was there any basis
24   on which you would modify the attribution of all
25   of the AM&M revenues to the damages in this case?
0308
 1                   L. Chodor
 2      A.   I would modify my report, but not the
 3   AM&M revenues.
 4      Q.   On what basis would you not modify the
 5   attribution of the AM&M revenues if, as the
 6   affidavit states, on personal knowledge, M-3 has
 7   been used only by a different division, other than
 8   AM&M, and has never generated revenues of any kind
 9   for the AM&M business?
10           MR. AFRAN:  I object to the form and
11      your charaterization.
12           I don't believe that the affidavit says
13      what you say it says.
14      Q.   "In particular, M3 has not been used by
15   the L-3 AM&M business reporting division which has
16   no access to M3 or use of M3 in any way.  M3
17   cannot generate and has not generated any revenues
18   for the AM&M business."
19           If this factual recital by a person who
20   says he has personal knowledge of these facts is
21   assumed, would you not have to withdraw the
22   application of all of the AM&M revenues to the
23   damages?
24           MR. AFRAN:  I object to the form.
25      A.   No, I would not withdraw any of the AM&M
0309
 1                   L. Chodor
 2   revenues as a result of this statement.
 3      Q.   Because?
 4      A.   Because all that is indicated here is
 5   that M-3 revenues are included in a different
 6   division.  It doesn't --
 7      Q.   That is not what we just --
 8           MR. AFRAN:  Excuse me.
 9           Do not interrupt him.  Let him answer.
10      Do not interrupt him.
11      Q.   Go ahead.
12      A.   He has indicated that the M-3 revenues
13   are in the Proprietary Programs component.
14           He has not stated anything here about
```

```
15   the software, the source code, whether that is
16   being used by AM&M.
17           He has only stated that M-3, what the
18   company L-3 calls M-3 -- and they can call it
19   whatever they want -- they can call it M-33,000
20   for all I care, that is meaningless -- that
21   revenues from the M-3 contract with the government
22   for the software are included in a different
23   division.
24           I would modify my report to include the
25   revenues generated by that other division in
0310
 1                L. Chodor
 2   addition to the revenues of the AM&M division, if
 3   this statement is ultimately found to be true.
```

```
0334
 1                L. Chodor
 2           I have reviewed many license agreements.
 3   I have determined royalty rates on many occasions.
 4           I feel very qualified to determine what
 5   a reasonable royalty rate is.
 6      Q.   The question is, in the airline
 7   industry, with which you have no familiarity, is
 8   it an accustomed basis to set a maintenance
 9   software license fee on the basis of annual
10   revenues of the user; you have no reason to
11   believe that is the case in the airline business,
12   right?
13           MR. AFRAN:  I object to the form.
14      A.   I have not stated that that is the basis
15   used in the airline industry.
16           There are many different ways to
17   determine what you want to charge for the use of
18   your license.
19           Every software owner has the ability to
20   charge a fee.
21           They don't have to disclose to the
22   licensee how they are arriving at that fee,
23   whether in their mind it is a percentage of the
24   user's revenues, whether it's a set fee per
25   airplane being maintained.  There are a lot of
0335
 1                L. Chodor
 2   different methodologies that can be employed.
 3           What I could employ here was a
 4   methodology -- since I have the facts, I know what
 5   the airline's revenues were, I know what the
 6   annual fee was, by dividing the annual fee by the
 7   annual revenue I can come out with an implied
 8   royalty rate.
 9           It's a fact.  I have not done -- there
10   is nothing subjective about this.  It's a
11   straightforward calculation.
12      Q.   The fact is the calculation only, not
13   that it was the basis for the license fee.
14           The trouble is, you see, what you have
15   done is take the same methodology, and applied it
16   to $2 billion worth of revenues without a basis
17   that this is a proper method.
18           You can do the division, but is it a
19   reasonable fee for a license in the airline
20   industry?
21           The answer is, you have no basis for
22   saying so, all you did is make calculations; is
23   that right?
24           MR. AFRAN:  Well, you have answered the
25      question, Mr. Gelb.  He does not have to.
0336
 1                L. Chodor
 2      Q.   Is that right?
 3           MR. AFRAN:  There is no question,
 4      Mr. Gelb.
```

```
 5            MR. GELB:  "Is that right?" is a
 6       question.
 7            MR. AFRAN:  I don't know what the
 8       question is.  You have made a speech.
 9            MR. GELB:  If I had put it to you, you
10       would have a problem, but I put it to the
11       witness.
12            MR. AFRAN:  Excuse me, but I have a
13       problem if you put a question to him that is
14       unintelligible.
15            Do you understand the question?
16            THE WITNESS:  No.
17            I need it to be read back.
18            MR. AFRAN:  This was a speech to the
19       jury.
20            It may be very good in the right
21       setting, but it's not a question.
22            We thank you for telling us your theory
23       of the case, by the way.
24            (Question read.)
25            MR. AFRAN:  The question is, "All you
0337
 1                 L. Chodor
 2       did was make the calculations; is that
 3       right"?
 4            Is that the question?
 5            MR. GELB:  She read it.
 6       Q.   You answer it, please.
 7            THE WITNESS:  You have to read that
 8       back.
 9            MR. AFRAN:  There was a final thing that
10       sounded like a question.
11            Mr. Gelb, if that is the question, say
12       so.
13            MR. GELB:  She will read it back.
14            (Question read.)
15            MR. AFRAN:  I object to the form.
16       Q.   Go ahead.
17       A.   That is not correct.
18       Q.   In what respect is this calculation
19   proper as a basis for a license fee in the
20   aircraft industry?
21       A.   This basis, along with the other
22   methodologies employed in my report, are supported
23   by treatise, by case law, and they stand on their
24   own.
25            They are a reasonable methodology for
0338
 1                 L. Chodor
 2   calculating damages in an infringement matter.
 3       Q.   What treatise says that?
 4       A.   I can pull it out of the AICPA practice
 5   aid.  That is the treatise.
 6            MR. AFRAN:  He has identified the
 7       treatise.
 8       Q.   Tell me the section of the treatise.
 9            MR. AFRAN:  He does not have it in front
```

```
10        of him.
11             MR. GELB:  Well, let's give it to him
12        and have him identify it.
13             It is Exhibit 5.
14        A.   Page 48, "The case law on reasonable
15   royalty for nonpatent intellectual property suits
16   borrows from the more developed body of case law
17   from patent disputes."
18             Later on page 48, "Establish Royalty -
19   To recover an award of damages based on an
20   established royalty rate, the patent owner" -- or,
21   in this case, the copyright owner -- "needs to
22   show that a licensing agreement covering the
23   patent was entered into with another party,
24   typically prior to a lawsuit or threat of a
25   lawsuit.  The patent holder may have to
0339
 1                  L. Chodor
 2   demonstrate that multiple parties have found the
 3   royalty rate to be reasonable."
 4             It goes on, "In general, the analyst
 5   should consider whether the royalty rate was
 6   accepted by enough members in the industry to be
 7   considered reasonable."
 8             I, in my judgment as an expert, reviewed
 9   these four agreements, and determining -- in my
10   mind, determining the implied royalty rate based
11   on these four agreements is one of the
12   methodologies that is set forth in the treatise
13   for determining a reasonable royalty rate.
14        Q.   What the treatise told you to do was to
15   arrive at a rate based on an established royalty
16   rate.
17             There is no royalty rate established by
18   this Western Pacific Airlines document, other than
19   the flat fee.
20             You created something outside the flat
21   fee, not an established contract rate, nothing
22   reflected by the terms of the agreement, to
23   perform some division and call it a royalty rate,
24   but it's not established by the contract terms, as
25   you have told us twice today, correct?
0340
 1                  L. Chodor
 2             MR. AFRAN:  I object to the form.
 3             This question has multiple speeches in
 4        it, Mr. Gelb.
 5             Come on, just focus your question a
 6        little bit.
 7        Q.   Go ahead.
 8             MR. AFRAN:  Do you understand the
 9        question, Mr. Chodor?
10             THE WITNESS:  Would you read the
11        question back to me, please.
12             MR. AFRAN:  Mr. Gelb, with all due
13        respect, I don't mind the subject matter,
14        obviously, but we are taking a long time with
```

```
15      these narrative questions.
16          I have to leave by 4:00, as I said.
17          (Question read.)
18          MR. AFRAN:  You are saying that the
19      royalty rate is not established by the
20      contract terms in the Western Pacific
21      document; is that your question?
22          MR. GELB:  Yes.
23      A.   The royalty rate is implied by dividing
24  the fee by the entity's annual revenues.
25      Q.   But the contract terms don't say that is
0341
 1                L. Chodor
 2  the way that the fee gets set, do they?
 3          MR. AFRAN:  You have asked this before,
 4      and he has answered it already.
 5      A.   The contract does not state a royalty
 6  rate.
 7      Q.   Take a look at the Western Pacific
 8  financial document, which I gather was not
 9  produced until February of 2010, by the date on
10  the document, which came out of the SEC Edgar
11  system, right?
12      A.   That is correct.
13      Q.   Did you pull this document yourself, or
14  was it supplied to you?
15      A.   One of my staff people did it.
16      Q.   At your direction?
17      A.   Yes.
18      Q.   At anyone's suggestion; Mr. Rand,
19  perhaps?
20      A.   I don't think so, no.
21      Q.   With his knowledge and discussion, was
22  that one of the items that you discussed with
23  Mr. Rand or Mr. Afran, that you would use these
24  documents to set an implied rate?
25          MR. AFRAN:  I object to the form.
0342
 1                L. Chodor
 2      A.   As the expert, I determined the
 3  methodology, and I am sure that I discussed it
 4  with Mr. Rand during the course of my engagement.
```